# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| Respondent, | ) | |
| | ) | No. 73339-7-I |
| v. | ) | |
| | ) | PUBLISHED OPINION |
| JESSICA L. KOHONEN, | ) | |
| | ) | |
| Appellant, | ) | FILED: February 8, 2016 |
| | ) | |

DWYER, J. — J.K. was adjudicated guilty, in juvenile court, of cyberstalking based on two tweets that she sent from her personal Twitter account. She now appeals, contending both that insufficient evidence was adduced to establish that she acted with the intent to "harass, intimidate, torment, or embarrass" another person and that insufficient evidence was presented that her tweets constituted "true threats." Because we agree that insufficient evidence was presented that J.K.'s tweets constituted a true threat, we reverse the conviction and remand for the cause to be dismissed with prejudice.

I

When J.K. was in eighth grade, a classmate, S.G., informed a teacher that another student was behaving oddly. As a result, the other student and J.K. were both suspended from school. J.K. and S.G. had no other interaction until

the incident at the center of this case.

Two years later, when J.K. and S.G. were sophomores in high school, they shared a first period class. One morning, J.K. saw S.G. in class and was reminded of the incident two years before. She quickly posted two short messages, known as tweets, via the web site Twitter. The first read, "Tbh[1] I still want to punch you in the throat even tho it was 2 years ago." The second read, "#[S.G.]mustdie."

J.K. later explained that she posted tweets frequently. She used Twitter as a "virtual diary," posting her thoughts, reactions, feelings, and more. She testified that she sent the messages quickly and without thinking, as a fleeting expression of her agitation at the memory from middle school. Although she was aware that the posts were public, and that she had approximately 100 people who followed her,[2] she testified that she did not consider the potential impact her tweets might have on S.G.

After school that day, J.K. and a friend, J.G., were walking through the school and saw "a bunch of red paint" spilled on the ground. J.G. joked to J.K. that it looked as if someone had been murdered. J.K. responded by tweeting the word "murder."

For nearly a full day after these tweets, there was no reaction. None of J.K.'s Twitter followers mentioned them to her or, to her knowledge, responded to them in any way. S.G. was unaware of the tweets. The next day, however, another student, I.R., who follows J.K. on Twitter, noticed the tweets and showed

---

[1] Testimony established that "Tbh" is an abbreviation for "to be honest."
[2] Testimony established that a user's "followers" are other users who have chosen to subscribe to that user's tweets.

them to S.G.

I.R. later explained that the only reason she became aware of J.K.'s tweets was that she followed J.K. on Twitter, which meant that anything that J.K. posted automatically appeared on I.R.'s Twitter page. I.R. also explained that, because J.K.'s Twitter account was public, anyone who searched for her page could see the things that she had posted that were not specifically blocked.

S.G. testified that she felt angry and embarrassed upon learning of the tweets because she knew that others would see them. She was not frightened, though, because she did not think that J.K. would actually hurt her. Nevertheless, S.G. decided to bring the tweets to the attention of school administrators. She first showed them to Nicole Lockhart, the dean of students, whom she encountered on the way into the administration building. Lockhart consulted with other administrators before summoning the school resources officer, Officer George Brown of the Bellingham Police Department.

Lockhart and Brown reviewed the tweets together with S.G. and her mother, whom S.G. had called soon after seeing the tweets. Despite the significant time difference between the tweets about S.G. from the prior morning and the "murder" tweet from the prior afternoon, because they appeared in sequence on J.K.'s Twitter page,[3] the group treated the tweets as if all three were related.

J.K. was taken from class to the administration office, where Lockhart and Brown confronted her with the tweets. J.K. immediately admitted that she had

---

[3] Testimony established that tweets appear on the author's Twitter page in reverse chronological order.

written and posted the tweets but stated that she had not intended for her actions to harm S.G. J.K. also explained that the "murder" tweet was unrelated to the other two.

J.K. was charged with one count of cyberstalking. After trial, the commissioner adjudicated J.K. guilty as charged, finding that J.K. had acted with the intent to embarrass, harass, and torment S.G. and that she was not credible on the question of whether she had considered the effect the tweets could have before posting them. The court also concluded that the tweets constituted a true threat. J.K. was sentenced to six months of probation and 30 hours of community service.

The superior court denied J.K.'s motion to revise. A notice of appeal was timely filed.

II

J.K. contends that insufficient evidence was presented that the tweets in question constituted "true threats," as required by the federal and state constitutions. This is so, she asserts, because a reasonable person in her position would not have foreseen that the tweets would be interpreted as serious threats to inflict harm. We agree.

We review the superior court's ruling, not the commissioner's.

> On revision, the superior court reviews both the commissioner's findings of fact and conclusions of law de novo based upon the evidence and issues presented to the commissioner. In re Marriage of Moody, 137 Wn.2d 979, 993, 976 P.2d 1240 (1999);[] State v. Wicker, 105 Wn. App. 428, 433, 20 P.3d 1007 (2001). Once the superior court makes a decision on revision, "the appeal is from the superior court's decision, not the commissioner's."

State v. Hoffman, 115 Wn. App. 91, 101, 60 P.3d 1261 (2003)[, reversed on other grounds, 150 Wn.2d 536, 78 P.3d 1289 (2003)].

State v. Ramer, 151 Wn.2d 106, 113, 86 P.3d 132 (2004).

The due process clauses of the federal and state constitutions require that the government prove every element of a crime beyond a reasonable doubt. Apprendi v. New Jersey, 530 U.S. 466, 476-77, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000); U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3. "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319.

"The purpose of this standard of review is to ensure that the trial court fact finder 'rationally appl[ied]' the constitutional standard required by the due process clause of the Fourteenth Amendment, which allows for conviction of a criminal offense only upon proof beyond a reasonable doubt." State v. Rattana Keo Phuong, 174 Wn. App. 494, 502, 299 P.3d 37 (2013) (alteration in original) (quoting Jackson, 443 U.S. at 317-18), review denied, 182 Wn.2d 1022 (2015). This standard of review is also designed to ensure that the fact finder at trial reached the "subjective state of near certitude of the guilt of the accused," as

required by the Fourteenth Amendment's proof beyond a reasonable doubt standard. Jackson, 443 U.S. at 315.

"A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence and direct evidence carry equal weight when reviewed by an appellate court. State v. Goodman, 150 Wn.2d 774, 781, 83 P.3d 410 (2004). Finally, we defer to the fact finder on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence. State v. Rodriquez, 187 Wn. App. 922, 930, 352 P.3d 200, review denied, 184 Wn.2d 1011 (2015).

J.K. was charged with misdemeanor cyberstalking contrary to RCW 9.61.260, which provides, in pertinent part:

> (1) A person is guilty of cyberstalking if he or she, with intent[4] to harass, intimidate, torment, or embarrass any other person, . . . makes an electronic communication to such other person or a third party:
> . . .
> (c) Threatening[5] to inflict injury on the person or property of the person called or any member of his or her family or household.

Thus, to convict J.K. of the crime of cyberstalking, the State was required to prove, in pertinent part, each of the following elements beyond a reasonable doubt: (1) that J.K. made an electronic communication to another person, (2) that, at the time J.K. made the electronic communication, she specifically intended to harass, intimidate, torment, or embarrass another person, and (3)

---

[4] "A person acts with intent or intentionally when he or she acts with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(1)(a).
[5] "'Threat' means to communicate, directly or indirectly the intent . . . [t]o cause bodily injury in the future to the person threatened or to any other person." RCW 9A.04.110(28)(a).

that J.K. threatened to inflict injury on the person to whom the electronic communication was made. See 11 WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 36.82 (3d ed. Supp. 2014).

J.K. contends that insufficient evidence was presented to support a finding that her tweets constituted "true threats."

Where a threat to commit bodily harm is an element of a crime, the State must prove that the alleged threat was a "true threat." State v. Kilburn, 151 Wn.2d 36, 54, 84 P.3d 1215 (2004). This is because of the danger that the criminal statute will be used to criminalize pure speech and impinge on First Amendment rights. True threats are not protected speech because of the "fear of harm aroused in the person threatened and the disruption that may occur as a result of that fear." Kilburn, 151 Wn.2d at 46.

The test for determining a "true threat" is an objective test that focuses on the speaker. Kilburn, 151 Wn.2d at 54. The question is whether a reasonable person in the speaker's position would foresee that the threat would be interpreted as a serious expression of intention to inflict the harm threatened.[6]

---

[6] We recognize that there is some disagreement among the federal circuit courts regarding the test for whether speech rises to the level of a true threat. This disagreement stems from divergent readings of the Supreme Court's opinion in Virginia v. Black, 538 U.S. 343, 360, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003), in particular the statement that "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons *with the intent* of placing the victim in fear of bodily harm or death." (Emphasis added.) Following Black, a majority of the federal courts of appeals continued to apply the objective test of true threats set forth above. See United States v. Martinez, 736 F.3d 981, 986 (11th Cir. 2013) ("Black did not work a 'sea change,' tacitly overruling decades of case law by importing a requirement of subjective intent into all threat-prohibiting statutes."), overruled on other grounds, 135 S. Ct. 2798 (2015) (vacated and remanded in light of the statutory holding in Elonis v. United States, 575 U.S. __, 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015)); United States v. Elonis, 730 F.3d 321, 332 (3d Cir. 2013), overruled on other grounds, Elonis, 135 S. Ct. 2001; United States v. Nicklas, 713 F.3d 435, 440 (8th Cir. 2013); United States v. Jeffries, 692 F.3d 473, 479 (6th Cir. 2012); United States v. White, 670 F.3d 498, 508 (4th Cir. 2012). However, a minority of such courts began to apply a subjective test, requiring proof that the speaker

State v. Allen, 176 Wn.2d 611, 626, 294 P.3d 679 (2013); accord Kilburn, 151

Wn.2d at 46.

> A true threat is a serious threat, not one said in jest, idle talk, or political argument. Kilburn, 151 Wn.2d at 43 (citing United States v. Howell, 719 F.2d 1258, 1260 (5th Cir. 1983)). Stated another way, communications that "bear the wording of threats but which are in fact merely jokes, idle talk, or hyperbole" are not true threats. State v. Schaler, 169 Wn.2d 274, 283, 236 P.3d 858 (2010). The nature of a threat "depends on all the facts and circumstances, and it is not proper to limit the inquiry to a literal translation of the words spoken." State v. C.G., 150 Wn.2d 604, 611, 80 P.3d 594 (2003). Statements may "connote something they do not literally say . . . ." Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists, 290 F.3d 1058, 1085 (9th Cir. 2002). Consistently with this recognition, our court has held that "[w]hether a statement is a true threat or a joke is determined in light of the entire context" and that a person can indirectly threaten to harm or kill another. Kilburn, 151 Wn.2d at 46, 48. Further, "[t]he speaker of a 'true threat' need not actually intend to carry it out. It is enough that a reasonable speaker would foresee that the threat would be considered serious." Schaler, 169 Wn.2d at 283 (citation omitted).

State v. Locke, 175 Wn. App. 779, 790, 307 P.3d 771 (2013), review denied, 179

Wn.2d 1021 (2014).

Although the sufficiency principles set forth above are generally

applicable, because of the constitutional implications of our analysis, we conduct

a limited independent review of facts crucial to the true threat inquiry.

> [T]he First Amendment demands more than application of our usual standard of review for sufficiency of the evidence. Kilburn, 151 Wn.2d at 48-49. Instead, we must independently examine the

---

subjectively intended to threaten listeners. See United States v. Cassel, 408 F.3d 622, 633 (9th Cir. 2005) ("[S]peech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as a threat."). The Supreme Court has declined to address the constitutional question raised by Black. Elonis, 135 S. Ct. at 2012.

This debate, while interesting, is immaterial to our task. The Washington Supreme Court has consistently applied the objective test set forth above, including after the Black opinion was filed. See, e.g., State v. Allen, 176 Wn.2d 611, 626, 294 P.3d 679 (2013); Kilburn, 151 Wn.2d at 46. We follow this binding precedent.

whole record to ensure that the judgment does not constitute a
forbidden intrusion into the field of free expression. Kilburn, 151
Wn.2d at 50. We are required to independently review only crucial
facts, that is, those facts so intermingled with the legal question that
it is necessary to analyze them in order to pass on the
constitutional question. Kilburn, 151 Wn.2d at 50-51. In doing so,
we may review evidence in the record not considered by the lower
court in deciding the constitutional question. Kilburn, 151 Wn.2d at
51. However, our review does not extend to factual determinations
such as witness credibility. State v. Johnston, 156 Wn.2d 355, 365-
66, 127 P.3d 707 (2006).

Locke, 175 Wn. App. at 790-91.

Applying the foregoing principles of law to the facts herein, the relevant

question is whether a reasonable person in J.K.'s position would have foreseen

that the tweets would be interpreted as a serious expression of an intent to

physically harm S.G.

We focus first on the exact language of the tweets. In this regard, a

description of the threats at issue in Locke is useful.

Locke concerned a series of Internet threats made against former

Governor Christine Gregoire over approximately five minutes. In Locke's first e-

mail to the governor, the author identified his city as "Gregoiremustdie" and

stated his desire for her to witness a family member "raped and murdered by a

sexual predator." Locke, 175 Wn. App. at 791. The e-mail also stated that the

governor had "put this state in the toilet" and requested that she "pull the lever to

send us down before you leave Olympia." Locke, 175 Wn. App. at 791. The

court concluded that the various messages in the e-mail did not constitute a true

threat because the messages were "more in the nature of hyperbolic political

speech, predicting threatening personal consequences from the State's policies." Locke, 175 Wn. App. at 791.

Locke's second e-mail again identified his city as "Gregoiremustdie." In this e-mail, he addressed the governor with an emphatic, gender-specific epithet and expressed his opinion that she should be "burned at the stake like any heretic." Locke, 175 Wn. App. at 791. While noting that "[the e-mail's] message, expressed twice, [was] that the governor should be killed," the court concluded that, because of its "passive and impersonal phrasing," this email also did not constitute a true threat. Locke, 175 Wn. App. at 792. The author's message, it explained, "[was] that someone should kill the governor, not that he intends to." Locke, 175 Wn. App. at 791.

The final threat was submitted through the governor's website on a form entitled, "Invite Governor Gregoire to an Event." Using this form, the author, who again identified his organization as "Gregoire Must D[i]e," requested that an event be held at the Governor's mansion. He stated that the event's subject would be "Gregoire's public execution" and that the governor's role would be "Honoree." Locke, 175 Wn. App. at 792. He also noted that the event would last 15 minutes, the media would be invited, and the audience's size would be greater than 150. Locke, 175 Wn. App. at 793. The court concluded that, in this instance, taken in context, the communication constituted a "true threat." In the context of the author's threats, there had been a "rapid progression of [his] communications from expressing his displeasure with her to his blunt desire for her death." Locke, 175 Wn. App. at 792. In particular, the specificity of the final

- 10 -

communication "thr[e]w the threat into higher relief and translate[d] it from the realm of the abstract to that of the practical." Locke, 175 Wn. App. at 793. In the broader context, as Locke was aware, there had recently been a shooting of an elected official in another state. Furthermore, all of the witnesses from the governor's office testified that they took Locke's communications to be serious threats. Finally, Locke himself told police that he understood that his threats would be taken seriously.

A comparison of the text of the threats at issue herein with those analyzed in Locke suggest that—in terms of the words alone—the tweets do not constitute true threats. First, the similarity between Locke's "Gregoiremustdie" statement and J.K.'s "#[S.G.]mustdie" tweet is striking. Apart from the person named, the difference between the text of J.K.'s tweet and this part of Locke's e-mails is the hashtag. This difference is immaterial. The hashtag does not elevate the tweet to a true threat but, rather, is indicative of the social media context in which it was published. As summarized above, these statements were deemed not to constitute true threats in Locke.

There are also commonalities between J.K.'s second tweet and the threats analyzed in Locke. In particular, similar to the threats regarding violence against the governor or members of her family included in Locke's first two e-mails, J.K.'s second tweet expressed a *desire* to harm S.G., not an *intention* to do so. Again, the court in Locke held that the comparable statements—those expressing a desire for, or prediction of, violence—did not constitute true threats.

However, in true threat cases, it is not just the words and phrasing of the alleged threat that matter, but also the larger context in which the words were uttered, including the identity of the speaker, the composition of the audience, the medium used to communicate the alleged threat, and the greater environment in which the alleged threat was made. Herein, the combined high school and social media context in which the alleged threats were made further supports the conclusion that J.K.'s tweets did not constitute true threats.

The author of the alleged threats was J.K., an adolescent high school student. The intended audience was J.K.'s Twitter followers, approximately 100 of her friends and acquaintances—in short, members of her peer group. The alleged threats were disseminated via Twitter, a popular social media platform. Testimony established that J.K. and her peers used Twitter to "tweet their feelings, things that are going on, funny pictures, just pictures in general" and to "post [their] thoughts, [their] reactions to things, [their] feelings, things that happen to [them] on a daily basis[, and] inside jokes with friends."

The commissioner heard testimony regarding the actual reactions of three members of the intended audience—S.G., I.R., and an unidentified student at the same high school. These reactions provide a guide for that which constituted a reasonable reaction under the circumstances and, therefore, for what reaction a reasonable speaker under the circumstances would have foreseen. See Kilburn, 151 Wn.2d at 45 n.3 ("[I]n the vast majority of the cases . . . a reasonably foreseeable response from the listener and an actual reasonable response should be the same. . . . [T]he only case where there might be a different

outcome is where the recipient suffers from some unique sensitivity unknown to the speaker." (citing Doe v. Pulaski County Special Sch. Dist., 306 F.3d 616, 623 (8th Cir. 2002))).

The commissioner first heard about I.R.'s reaction to the tweets. I.R. testified that, when she saw the tweet that included S.G.'s name, she found it "suspicious," because she did not know that the two girls knew each other. She also testified that she allowed S.G. to bring her cellular telephone to the school administration office because "[i]t was a serious situation *for [S.G.]*." (Emphasis added.) I.R. was never asked whether she perceived the tweets to be serious threats to harm S.G. Nevertheless, based on the foregoing testimony, the State asks us to infer that I.R. so perceived the tweets. However, the strongest inference from the totality of I.R.'s testimony is to the contrary. I.R. also testified that she did not realize "to what extent" S.G. would involve the school administration or that S.G. would involve her mother "or anything like that" at all. If I.R. had taken J.K.'s tweets as a serious death threat, she certainly would not have been surprised by the manner in which S.G. involved both the school administration and her mother.

The commissioner next heard from S.G. who recounted not only her own response, but also the overheard response of another student. According to S.G., she heard another student at school talking about "how funny" the tweets were. Regarding her own response, S.G. repeatedly recalled feeling "upset," "angry," and "embarrassed" upon learning of the tweets.[7] By contrast, S.G.

---

[7] As the State acknowledged at oral argument, S.G.'s testimony that, upon seeing the tweets, she felt "upset," "angry," and "embarrassed" is different in an important way from her

- 13 -

repeatedly denied that she felt scared or afraid as a result of the tweets.[8]

Consistent with her stated lack of fear, after leaving the school administration building, S.G. returned directly to class. Thus, even S.G., who did not know J.K. well and who knew that J.K. might resent her because of the incident two years earlier, did not view these tweets as expressing an actual intent to cause physical

---

stating, for example, that she felt scared or afraid upon seeing them. Unlike feeling afraid or scared, the emotions that S.G. experienced do not reflect fear. Oral argument at 18:20-20:30. Therefore, even this evidence of S.G.'s reaction to the tweets fails to support the State's assertion that, viewed objectively, the tweets expressed or conveyed a serious threat to harm S.G.

[8] S.G. explicitly denied feeling scared or afraid at least twice.

The following exchange on the subject of her fear occurred during the defense attorney's cross-examination of S.G.:

Q    So earlier you said you were upset and angry, is that correct?
A    Yes.
Q    You weren't scared?
A    Not really, no.
Q    You didn't think [J.K.] was going to come hit you?
A    No.

S.G. confirmed her lack of fear during the prosecutor's redirect examination of her.

Q    [S.G.] you said you weren't scared that [J.K.] was going to actually jump out and hit you or hurt you in any way.
A    Correct.

Despite S.G.'s denials, the prosecutor repeatedly attempted to commit S.G. to testifying that she felt fear as a result of the tweets. For example, the following exchange transpired during the prosecutor's direct examination of S.G.:

Q    . . . You mentioned a few things, you mentioned being scared, is that accurate?
[Defense attorney]: Objection.
Q    How did you feel [S.G.] -- I'll ask her directly --
[Defense attorney]: Okay.
Q    How did you feel after you saw the tweets?
A    I was upset and embarrassed.

The prosecutor persisted during his redirect examination.

Q    [W]ere you scared of anybody other than [J.K.]?
[Defense attorney]: Objection, relevance.
    . . . .
[Prosecutor]: I ask, the question was asked of counsel earlier whether she was scared and she said she wasn't of [J.K.] but she had testified she was scared so I want to know who, what she was scared of, how she was scared.
[Defense attorney]: She's never testified that she was scared.
THE COURT: . . . She has said she was upset, angry and embarrassed and at one point she also said that she was upset and embarrassed and a third time she said she was upset and angry. She denied being scared of anything that [J.K.] said and she did not say she was scared in any of the previous answers. So if you ask her if she['s] scared, she's going to have to testify to that first because that's what counsel asked her.
[Prosecutor]: Okay.

No question regarding whether she was scared was forthcoming.

harm. Indeed, not one of the people in J.K.'s intended audience who testified perceived the tweets to be serious threats.

It is clear that both Lockhart and Brown—neither of whom was a member of J.K.'s intended audience—took the tweets seriously. However, it is not clear that the reason either adult took them seriously was because they perceived them to be true threats. Indeed, neither Brown nor Lockhart was asked at trial whether he or she perceived the tweets to be serious threats to inflict harm on S.G. There is reason to believe that Lockhart, at least, would have taken them seriously even if she did not believe them to be true threats because—true threats or not—they were affecting the high school dynamic. Furthermore, Brown testified that he was "particularly" interested in the "murder" tweet, which, as the commissioner found, was not at all related to the other two. Finally, both individuals testified that they were unfamiliar with Twitter. In fact, both stated that the underlying incident was the first time that Twitter had been at the center of an investigation in which they were involved.

J.K.'s tweets bear the signs of—admittedly mean-spirited—hyperbolic expressions of frustration, and that is precisely how they were received. A reasonable person in J.K.'s position would not have anticipated a different reception. Therefore, insufficient evidence was presented that the tweets constituted true threats. Because Lockhart and Brown were not part of J.K.'s peer group and were unfamiliar with Twitter, their reactions to J.K.'s tweets are a poor measure of the reaction that a reasonable person in J.K.'s position would have anticipated from her peers.

Reversed and remanded to the trial court for the cause to be dismissed with prejudice.[9]

We concur:

_____

_____

Dwyer, J.

Becker, J.

---

[9] Given our resolution of the true threat issue, we do not address J.K.'s additional contention that insufficient evidence was presented that she acted with the specific intent to "harass, intimidate, torment, or embarrass" S.G.