## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 34054-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| SETH EDEN ASH, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, A.C.J. — Seth Ash appeals his convictions for felony

harassment and fourth degree assault. He asks this court to reverse his harassment

conviction, arguing the State's evidence was insufficient to prove the victim's fear was

reasonable and was also insufficient to prove he communicated a true threat. He also

argues the trial court erred in imposing $100 in discretionary legal financial obligations

(LFOs) without inquiring into his ability to pay. We disagree with Ash's first argument,

remand to allow the trial court to correct its unintentional imposition of two discretionary

LFOs, and affirm his convictions.

FACTS

Ash lived in a house with his mother Ann Ash-Wolff and his stepfather David Wolff. In late August or early September 2015, one of Ash-Wolff's acquaintances, Michael Mize, was having a problem with where he was living and was going to become homeless. Ash-Wolff invited Mize to park his mobile home on their property and live in it. Mize did so, and parked the mobile home about 70 yards from the Ashs' house.

Ash and Mize got along most of the time. Mize liked Ash and once offered to take him fishing. However, on September 18, Ash-Wolff asked Mize to sit with her and Wolff on the porch in front of the house. As they were sitting and talking, Ash appeared and began yelling at Mize. Ash told Mize to leave the property and threatened to physically harm Mize if he did not leave. Ash then darted at Mize as if he was going to push Mize over. Wolff stepped between the two and walked Ash into the house. Mize did not want to start a problem, so he left.

A few days later, Ash confronted Mize about where Mize had parked his truck. Ash was angry, and told Mize that "he was going to come back and do something about it." Report of Proceedings (RP) at 219.

On September 27, Mize was working in the yard and needed a garbage can. He rode his motorcycle from his motor home to the Ashs' house to find one. The noise from

2

the motorcycle woke up Ash, who was inside the house trying to sleep. Mize rode back to his mobile home and sat sideways on the motorcycle. Mize then noticed Ash walking angrily toward him. Ash walked up to Mize and told him that he was a nuisance and had no right to be on the property. Ash then physically attacked Mize, and a brief melee ensued.

Ash started to leave but then turned around and came back. He warned Mize to "not report this," and that he "better not go call the police." RP at 249. He then told Mize that "he was going to come back and kill [him]." RP at 249.

Mize got into his truck and began driving into town to call the police. Although Mize had not reported the prior encounters with Ash, he decided to report this one because he believed his life was in danger. On his way into town, Mize saw a police officer stopped on the road. He pulled over to report what had happened. He was trembling and shaking as he gave his statement to the officer.

The State charged Ash with second degree assault and felony harassment based on the September 27 incident. The trial court ruled in limine that evidence regarding the two prior encounters was admissible to show that Mize's fear that Ash would carry out the threats was reasonable.

3

During trial, Mize described the melee on September 27. He testified that Ash initially pushed him, and then pulled out a knife and made slashing motions at his chest and arms. He testified the knife contacted his clothing, but did not actually cut him. He also testified that after slashing at him with the knife, Ash punched him on the forehead. The State introduced evidence that Wolff later found a knife in his woodshed, but the State was unable to establish whose knife it was or who had put it there. In addition to instructing the jury on second degree assault and harassment, the trial court instructed the jury on the lesser included offense of fourth degree assault.

The jury convicted Ash of fourth degree assault and harassment. At the sentencing hearing, defense counsel asked the court to only impose "the standard mandatory LFOs." RP at 471. Defense counsel argued that Ash had outstanding LFOs in six other cases and would be unable to make payments until he was released from confinement. Defense counsel also noted he did not know the last time Ash had a job or whether Ash was even employable.

The trial court imposed $800 in LFOs, which included a $500 victim assessment, a $200 criminal filing fee, a $50 bench warrant fee, and a $50 booking fee. The court did not expressly inquire into Ash's ability to pay, but noted Ash's substantial outstanding LFOs and then waived the court-appointed attorney fee and fine. The court stated the

4

booking fee was "pretty much required." RP at 480. Ash did not object. There was no discussion about the bench warrant fee.

Ash timely appealed.

## ANALYSIS

A.    SUFFICIENCY OF THE EVIDENCE

Ash argues the State presented insufficient evidence to prove Mize's fear was objectively reasonable. He also argues the State failed to prove he communicated a "true threat."

In a criminal case, evidence is sufficient to convict if it permits a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Munoz-Rivera*, 190 Wn. App. 870, 882, 361 P.3d 182 (2015). When a defendant challenges the sufficiency of the evidence, the proper inquiry is "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *Id.* "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Id.*

1.    *Reasonable fear of death*

To convict a person for felony harassment based on threats to kill, the State has to prove beyond a reasonable doubt that the defendant (1) without lawful authority (2) knowingly threatened to kill some other person immediately or in the future, and (3) the defendant's words or conduct placed the person threatened in reasonable fear that the threat to kill would be carried out. RCW 9A.46.020(1)(a)(i), (2)(b); *State v. C.G.*, 150 Wn.2d 604, 610, 80 P.3d 594 (2003) (felony harassment statute requires victim to reasonably fear the threat *to kill* will be carried out, not just fear bodily injury will be inflicted). Ash challenges the sufficiency of evidence only as to the last element—that Mize reasonably feared Ash would carry out his threat to kill.

This court applies an objective standard to determine whether the victim's fear that the threat will be carried out is reasonable. *State v. Ragin*, 94 Wn. App. 407, 411, 972 P.2d 519 (1999). The victim's knowledge of the defendant's prior violent acts is relevant to this question. *Id.* at 411-12.

Here, ample evidence supports the jury's finding that Mize reasonably feared Ash would carry out his threat to kill. During the very first encounter on the porch, Ash threatened to physically harm Mize and then darted at him. Ash then angrily confronted Mize a few days later and told him he was going to "come back and do something about

it." RP at 219. Both encounters were unprovoked. Ash also had a pattern of losing control, acting rashly, then apologizing later.

Moreover, immediately before making the threat at issue here, Ash—who was bigger and taller than Mize—angrily approached Mize, pushed him, slashed at him with a knife, and then hit him on the forehead.[1] Taking this violent confrontation together with the two earlier unprovoked encounters, there was sufficient evidence for the jury to conclude that Mize's fear was objectively reasonable.

Ash argues the evidence was insufficient because "Mr. Mize did not offer details as to why he believed that Mr. Ash's threat to kill him was believable." Br. of Appellant at 13. However, Mize specifically testified that he believed Ash would follow through

---

[1] Ash asks this court to reject any evidence that he used a knife in determining whether the evidence supports his harassment conviction, arguing the jury's decision to convict him of fourth degree assault "indicates the jury did not believe a knife was used." Br. of Appellant at 16-17. However, this court reviews the sufficiency of the evidence for any given count "independent of the jury's determination that evidence on another count was insufficient." *United States v. Powell*, 469 U.S. 57, 67, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984); *see also United States v. Hart*, 963 F.2d 1278, 1282 (9th Cir. 1992) ("[Defendant's] acquittal on the distribution count does not affect our consideration of the evidence supporting his conviction for conspiracy."). The fact that the jury was unable to reach a verdict on the second degree assault charge may show no more than jury lenity, compromise, or mistake, *Powell*, 469 U.S. at 66 n.7, and does not imply that the jury doubted the State's evidence about the knife. This is why "[a] claim of insufficiency admits the truth of the State's evidence." *Salinas*, 119 Wn.2d at 201.

7

with the threat because Ash had confronted him twice before "[j]ust out of the blue." RP at 254.

Ash also argues he had never threatened to kill or physically harmed Mize before making the threat on September 27. While this is true, Ash had previously threatened harm and had darted toward Mize as if he was going to harm him. Ash also argues he and Mize generally got along, and Mize once offered to take him fishing. Even so, Mize could still reasonably fear for his life on September 27. These facts are not mutually exclusive, especially in light of the violent confrontation that immediately precipitated the threat.

### 2. *True threat*

When a threat is an element of a crime, the State must prove that the alleged threat was a "true threat." *State v. Kohonen*, 192 Wn. App. 567, 575, 370 P.3d 16 (2016). This requirement exists so protected speech is not criminalized, as the First Amendment does not protect "true threats." *Id.*

"A 'true threat' is 'a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to . . . take the life of another person.'" *State v. Allen*, 176 Wn.2d 611, 626, 294 P.3d 679 (2013) (internal quotation marks omitted) (first

8

alteration in original) (quoting *State v. Kilburn*, 151 Wn.2d 36, 43, 84 P.3d 1215 (2004)). This is an objective standard that focuses on the speaker. *Kilburn*, 151 Wn.2d at 44. The speaker does not need to actually intend to carry out the threat. *Id.* at 46. "Whether a statement is a true threat or a joke is determined in light of the entire context, and the relevant question is whether a reasonable person in the defendant's place would foresee that in context the listener would interpret the statement as a serious threat or a joke." *Id.*

For example, in *Kilburn*, a group of eighth grade students were chatting, giggling, and laughing at the end of a school day. *Id.* at 52. Kilburn and another female student started talking about books they were reading, and Kilburn had a book about the military and guns. *Id.* Kilburn turned to the other student and, half smiling, said he was going to bring a gun the next day and shoot everyone, beginning with her. *Id.* Kilburn started to laugh or giggle as if he were not serious, and "'was acting kind of like he was joking.'" *Id.* Kilburn and the other student had known each other for two years, and Kilburn had always treated her kindly. *Id.* Kilburn was known to make jokes on occasion, which the other students laughed at. *Id.* The *Kilburn* court held a reasonable person in Kilburn's position would not have foreseen that his or her comments would be interpreted seriously and, thus, the State failed to prove the comments were a "true threat." *Id.* at 53-54.

9

In contrast, a reasonable person in Ash's position would have known that his threat would be interpreted seriously. Ash knew he had angrily confronted Mize twice without provocation and had threatened to physically harm Mize before. Immediately before threatening Mize's life, he also pushed, punched, and swung a knife at Mize.[2] There is no evidence he meant the threat as hyperbole or as a joke.

Viewing the evidence in the light most favorable to the State, this court concludes the evidence was sufficient for the jury to find that Mize's fear was reasonable and that Ash communicated a "true threat." Accordingly, sufficient evidence supports Ash's harassment conviction.

B.     ALLEGED LFO ERROR

Ash contends the sentencing court erred by ordering him to pay $100 in discretionary LFOs without first inquiring into his ability to pay.

RAP 2.5(a) provides that an "appellate court may refuse to review any claim of error that was not raised in the trial court." For this reason, "[a] defendant who makes no objection to the imposition of discretionary LFOs at sentencing is not automatically

---

[2] Although Ash does not agree this court should consider the evidence about the knife in determining whether the evidence supports his harassment conviction, he concedes this evidence, if considered, "might . . . support[ ] the conclusion that [he] could have reasonably foreseen that his threat to kill Mr. Mize . . . would be interpreted as a serious expression." Br. of Appellant at 17.

entitled to review." *State v. Blazina*, 182 Wn.2d 827, 832, 344 P.3d 680 (2015). "This rule exists to give the trial court an opportunity to correct the error and to give the opposing party an opportunity to respond." *Id.* at 832-33.

Ash argues he preserved this issue for appeal because he asked the sentencing court to only impose mandatory LFOs, which he contends was "plainly an objection to imposition of any non-mandatory LFOs." Br. of Appellant at 22. The problem here is that it appears the trial court believed it was only imposing mandatory LFOs, but actually imposed $100 in discretionary LFOs. This was likely error, but Ash never objected. If Ash had notified the court that the bench warrant fee and the booking fee were discretionary costs, the trial court would have been able to correct its error. But because he did not, he cannot appeal as a matter of right.

In the alternative, Ash asks this court to accept discretionary review, which each appellate court is entitled to do. *See Blazina*, 182 Wn.2d at 835. An approach favored by this author is to consider the administrative burden and expense of bringing a defendant to court for a new hearing, versus the likelihood that the discretionary LFO result will change. *State v. Arredondo*, 190 Wn. App. 512, 538, 360 P.3d 920 (2015), *review granted*, 185 Wn.2d 1024, 369 P.3d 502 (2016). "An important consideration of this analysis is the dollar amount of discretionary LFOs imposed by the sentencing court." *Id.*

In this case, the majority of these factors weigh in favor of reviewing Ash's unpreserved LFO challenge.

First, the dollar amount of the discretionary LFOs the trial court imposed does not support granting review. The trial court imposed both mandatory and discretionary LFOs. The mandatory LFOs included the $500 victim assessment and the $200 criminal filing fee. *See* RCW 7.68.035(1)(a); RCW 36.18.020(2)(h). These mandatory LFOs are required irrespective of Ash's ability to pay. *State v. Lundy*, 176 Wn. App. 96, 103, 308 P.3d 755 (2013). The discretionary LFOs in this case were the $50 bench warrant fee and the $50 booking fee, totaling $100. *See* RCW 10.01.160(2); RCW 70.48.390.

However, the second factor—the administrative burden and expense of bringing Ash to court for a new sentencing hearing—weighs in favor of review. This is because the trial court can address the LFO issue without Ash being present and answering questions about his ability to pay.

The final factor—whether the LFO result would likely change—also weighs in favor of review. At sentencing, the trial court declined to impose other discretionary LFOs and believed the booking and bench warrant fees were mandatory. Had the trial court known the fees were discretionary, it likely would not have imposed them.

12

No. 34054-6-III
*State v. Ash*

We therefore weigh the factors, agree to review the unpreserved error, and determine remand is appropriate so the trial court can correct its unintentional imposition of discretionary LFOs.

C.   APPELLATE COSTS

Ash also requests this court to decline to impose appellate costs in its decision terminating review. In response, the State says it does not intend to seek appellate costs. We therefore grant Ash's request and decline to impose appellate costs.

Affirmed in part and remanded.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, A.C.J.

WE CONCUR:

Siddoway, J.

Pennell, J.

13