IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| HOLLY THRASHER, | ) | No. 81277-7-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| TODD THRASHER, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

ANDRUS, A.C.J. — Todd Thrasher appeals a domestic violence protection order (DVPO) protecting his teenage children and his ex-wife, Holly Thrasher.[1] Holly's petition stemmed from an incident during which Todd punched their teenage son and subsequent telephonic threats Todd made to Holly which she recorded without Todd's consent. Todd contends the recorded conversation was inadmissible and his conduct did not rise to the level of domestic violence. We disagree and affirm.

FACTS

Holly and Todd divorced in 2018 after a twenty-year marriage. Following their divorce, Holly and Todd shared joint custody of their son, P.T., age 15, and daughter, E.T., age 13 at the time of the incident at issue here.

_____

[1] For clarity, we refer to the parties by their first names. No disrespect is intended.

Citations and pin cites are based on the Westlaw online version of the cited material.

On November 7, 2019, while driving the children to school, Todd confronted E.T. about not having a jacket. Holly testified that Todd told E.T. to "get the fuck out of my car" and "reached over and opened the door and pushed her [and] then drove away." Todd denied he "pushed" E.T. but admitted he told her to get out "if she wanted to talk to me in that tone of voice." E.T. called Holly to ask what she should do. While E.T. was on the phone with Holly, Todd returned, told E.T. to get back in the car, reprimanded E.T. for calling Holly, told her she was being rude, just like her "bitch" of a mother, and took E.T.'s phone away from her. Todd admitted he referred to Holly as a bitch.

P.T., sitting in the back seat, overheard the comment and—not surprisingly—became angry and told Todd not to disparage their mother. Todd admitted he yelled at P.T. because Todd was "tired of the way he talk[ed] to [him] and how disrespectful it was." To "discipline" his teenage son for mimicking Todd's own conduct, Todd demanded that P.T. turn his cell phone over. According to Holly, Todd told P.T. that he would "pull over and beat the shit out of [him]" if he did not relinquish his phone and then Todd "reached back between the seats and punched [P.T.] in the leg and began swiping at [P.T.'s] phone which resulted in scratch marks on [P.T.'s] face." P.T. and E.T. told their mother that Todd hit P.T. with a closed fist on the leg as a way of trying to get P.T. to let go of his phone. Todd admitted that he tried to take the phone but denied threatening or punching P.T.

At school, P.T. reported the incident to his school counselor. After school, P.T. also disclosed the incident to his personal counselor. Each counselor independently reported the incident to Child Protective Services (CPS).

When Holly picked P.T. and E.T. up from after-school activities that afternoon, they both told her what had happened. Neither wanted to return to their father's house. They told Holly they did not feel safe with Todd. Although they discussed calling Todd to tell him they did not intend to return that night, P.T. believed Todd would be very angry at the children if they did not return, so Holly drove them back. On the way, Holly worked out a safety plan with them and identified a place the teens could walk to in the event they felt unsafe with Todd. Nothing further occurred that night.

The following week, Holly received an envelope in the mail from Todd. Inside the envelope were a number of family photos. The photos in which Todd appeared with the rest of the family had been ripped up. In addition, Todd began sending text messages to Holly that "were really random, off-the-wall, threatening." She described one text in which Todd let her know he had picked the kids up from the dentist and they had no cavities. The next line of the same text read "Change your F'ing last name." When Holly indicated she had no intention of doing so, Todd continued to send texts in which he threatened to go to her work and "tell them who [Holly] really [is]." She became frightened that Todd intended to show up at Nordstrom, where she worked, and do something to her. She talked to a couple of coworkers to determine if she should let the company security know about

Todd's threats. She ordered pepper spray on the Internet on November 11 for her personal safety as a result of Todd's behavior.

At this point, Holly felt Todd needed time away from the children and, on November 14, called him to convince him to let her keep the children during his next scheduled residential time. Unbeknownst to Todd, Holly recorded the call. During the call, Holly suggested the children should stay with her for a while because of the growing tension with Todd and because both reported to her that they were afraid of staying with him. Todd became angry, disagreeing with her "bullshit comment." When Holly confronted Todd about punching P.T. in the car, Todd became agitated, repeatedly calling Holly a "dumb bitch" and telling her to "fuck off." Todd then said

> [Todd]: You know what? Fuck it. You want me to be a dick, I'll be a fucking dick. I'll come down there and I'll fuck you up so bad with fucking your little Nordstrom bullshit. I will fuck -- seriously, if you want me to do that, I will. Do you want me to do that?
>
> [Holly]: But do you understand --
>
> [Todd]: (Inaudible) Pete and everybody know what the fuck you did (inaudible)?

Todd ended the call with "Hey, Holly, fuck off. I didn't fucking hit him. And if you say it again, I'll fucking (inaudible) you fucking bitch." After the call, Holly was so jolted, she began to shake and cry.

In an e-mail dated the same day as the call, Todd disparaged the teens as "little shits," called Holly "evil," and said P.T. was a "little prick." He admitted he had told the children how mad he was at Holly for "breaking up the family." In the

profanity-laced e-mail, he told Holly "Again, you caused all this by giving up on me, so yes I am very bitter towards you!!!!! And will NEVER forgive you."

Holly was so frightened that she contacted her company human resources department to report that Todd was not mentally well and she did not know what he might do. She spoke with the company security and legal departments as well.

The next day, Holly filed a petition for an order of protection on behalf of her children and herself. As safety measures, she ordered a security system for her home and had friends spend the night with her when she initiated service of the temporary protection order.

At a December 18, 2019, hearing before a commissioner, Todd argued the November 14 phone call and all testimony about his statements during the call were inadmissible because Holly recorded it without his consent. The commissioner ruled the recording was admissible as an exception to the two-party consent rule of RCW 9.73.030(2)(b) for "threats of extortion, blackmail, bodily harm, or other unlawful requests or demands." The commissioner listened to the recording, the pertinent parts of which were transcribed, before issuing a ruling.

Todd also argued his actions toward P.T. were reasonable discipline and permissible under RCW 9A.16.100, and Ugolini v. Ugolini, 11 Wn. App. 2d 443, 453 P.3d 1027 (2019). The commissioner rejected this argument, noting that under the discipline "safe harbor" statute, striking a child with a closed fist is presumptively unreasonable. The commissioner found Holly met her burden of proving domestic violence and granted the DVPO.

Todd filed a motion to revise the commissioner's ruling, and the superior court heard argument on this motion on January 31, 2020. The superior court concurred with the commissioner's ruling and denied the motion to revise. The court entered these specific findings:

> The commissioner presiding over this case found that the father had punched the child in the leg with a closed fist in a heated moment while riding in the car. The Court concurs and finds that the threat of harm on the mother was likewise appropriately found by the commissioner.
>
> The finding of DVPO must also be interpreted under RCW 9.73.030 and whether that prohibits the mother from introducing evidence that was recorded by her. The Court heard, from the recording of the proceeding below, that mother's recording was played. The Court finds that the exception for one-party recording, under the statute, applies here.
>
> Despite father's arguments at the revision hearing, and explanation that this was a heated exchange, which was obvious from the language used in the phone call, the Court finds that the totality of the language used with the background of prior incidents of threats, as well as father's telling November 15 email where he apologizes for the hateful things he said but states "I'm still obviously hurt and mad at you and the situation," the Court finds father's threats to mother to be credible.

Todd appeals.

## ANALYSIS

Todd raises three main arguments on appeal. First, he contends the court erred in considering the content of his November 14 recorded telephone call with Holly because he did not threaten to harm her physically during that call. Second, he contends the court failed to analyze the safe harbor statute of RCW 9A.16.100 and failed to make explicit findings that his discipline of P.T. was excessive. Third, he challenges the sufficiency of the evidence supporting the finding that he

committed domestic violence against P.T., E.T., and Holly. Finally, he asks us to reverse any attorney fee award to Holly. We address each argument in turn.

Because a commissioner's decision is subject to revision by the superior court under RCW 2.24.050, and the superior court's review of any commissioner ruling is de novo, this court reviews the superior court's ruling, not that of the commissioner. Maldonado v. Maldonado, 197 Wn. App. 779, 789, 391 P.3d 546 (2017).

A. Admissibility of Cell Phone Recording

Todd argues the trial court erroneously admitted Holly's recording of the November 14 phone conversation and all related testimony.[2] He contends that recording is inadmissible because it was made in violation of the Washington Privacy Act, chapter 9.73 RCW.

RCW 9.73.030(1) makes it unlawful for any person to intercept or record a private communication without first obtaining the consent of all parties participating in the conversation. While private conversations recorded without the consent of all participating parties are inadmissible under RCW 9.73.050, conversations which "convey threats of extortion, blackmail, bodily harm, or other unlawful requests or demands" may be recorded with the consent of one party to the conversation. RCW 9.73.030(2)(b). Whether a private communication is protected by the Privacy Act is a question of law which we review de novo. State v.

---

[2] Holly argues Todd waived this issue for appeal when his attorney recounted his understanding of what was said on the recording and when he subsequently directed the court to the pertinent part of the recording. But Todd objected to the admissibility of the recording and Holly's testimony about the conversation in his briefing before the commissioner and then objected at the hearing itself. Todd renewed this objection in his motion to revise. Todd has preserved the issue for appeal.

Gearhard, 13 Wn. App. 2d 554, 561, 465 P.3d 336, (citing State v. Kipp, 179 Wn.2d 718, 728, 317 P.3d 1029 (2014)), review denied, 196 Wn.2d 1015, 473 P.3d 250 (2020).

Holly admits she recorded a private communication with Todd without his consent. Holly contends that the recording was admissible because Todd conveyed what Holly reasonably believed were threats of both bodily harm and extortion in the call. Todd argues he did not explicitly threaten to physically harm Holly. But the exception is not limited to express threats of bodily harm. In State v. Babcock, 168 Wn. App. 598, 608, 279 P.3d 890 (2012), we held that the verb "convey," in RCW 9.73.030(2)(b) means "'to impart or communicate either directly by clear statement or indirectly by suggestion, implication, gesture, attitude, behavior, or appearance'" (citing WEBSTER'S NEW INTERNATIONAL DICTIONARY 499 (3d ed. 1966)). Thus, when evaluating the applicability of the threat exception to the Privacy Act, the court may look to indirect suggestions as well as a person's attitude, behavior, and appearance when making the statement at issue. Here, the superior court heard Todd's yelling, repeated profanity, and name-calling, and the words he used – "I'll come down there and I'll fuck you up so bad" – in context with his abusive texts and e-mails and his physical assault of P.T. and reasonably concluded Todd's communication with Holly constituted a threat of physical harm under RCW 9.73.030(2)(b).

Todd argues that, to be admissible evidence under the Privacy Act, the threat conveyed must be a "true threat" not protected as free speech under the First Amendment. In State v. Kilburn, 151 Wn.2d 36, 48, 84 P.3d 1215 (2004), our

Supreme Court held that a defendant could not be convicted of harassment under RCW 9A.46.020(1)(a)(i) unless the State proved a defendant's threat to kill was a "true threat," defined as a statement that a reasonable person would foresee would be interpreted as a serious statement of intent to inflict serious bodily injury or death. Accord State v. Kohonen, 192 Wn. App. 567, 576, 370 P.3d 16 (2016) (student's tweet that "#[S.G.]must die" was not a true threat sufficient to support conviction for harassment). But Kilburn and Kohonen addressed a statute that criminalized threats to kill, not the scope of the Washington Privacy Act exception for threats of extortion, blackmail, or bodily harm. Todd does not cite, and this court has not found, any reported case holding that the threat exception under RCW 9.73.030(2)(b) is limited to "true threats" of bodily harm.

Indeed, the statute itself refers not only to threats of bodily harm but also to threats of "extortion." Extortion is not defined by the Privacy Act. When a statutory term is undefined, we give the words their ordinary meaning. State v. Gonzalez, 168 Wn.2d 256, 263, 226 P.3d 131 (2010). To "extort" is defined as "to obtain from an unwilling or reluctant person by physical force, intimidation." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 806 (2002). The common law defines "extortion" as the "practice or an instance of obtaining something or compelling some action by illegal means, as by force or coercion." BLACK'S LAW DICTIONARY 729 (11th ed. 2019).

Here, Todd's statements during the recorded phone call indicate his intent to intimidate Holly into abandoning her allegations that Todd hit P.T. When Holly suggested Todd take a break from the kids and that the kids were scared, Todd

told Holly he would "come down there and I'll fuck you up so bad with fucking your little Nordstrom bullshit." The content of Todd's comments suggest he was threatening to reveal some confidential or private information regarding the parties' divorce to Holly's colleagues or her superiors in order to diminish her reputation. And he tied his threats of disclosure to his demand that she stop alleging that he hit P.T.—he told her "I didn't fucking hit him. And if you say it again, I'll fucking (inaudible) you fucking bitch" within minutes of threatening to reveal private information to Holly's colleagues at Nordstrom.

Todd argues the Privacy Act threat exception does not apply because Holly initiated the conversation by calling him and began recording before any threatening comments were made. But Todd fails to identify any statutory language or any case law supporting the contention that the exception only applies if the party making threats initiates the call. Moreover, Holly testified she recorded the call because she was concerned about Todd's "really off-the-wall, threatening text messages" and wanted to be prepared in case he threatened her again. Under these circumstances, we cannot conclude her recording was unlawful.

Because Todd's statements, in context, were threats of bodily harm and extortion, the superior court did not err in concluding they fell within the threat exception set out in RCW 9.73.030(2)(b) and in admitting the recording.

B. Substantial Evidence Supporting the DVPO

Todd contends the evidence presented was insufficient to support a finding that Todd committed domestic violence against P.T., E.T., or Holly.

We review a trial court's decision to grant an order of protection for an abuse of discretion. Ugolini, 11 Wn. App. 2d at 446. The court abuses its discretion if it makes its decision "on untenable grounds or for untenable reasons, or if its decision was reached by applying the wrong legal standard." Maldonado, 197 Wn. App. at 789. Where the trial court weighed contradictory evidence, "[w]e review the superior court's findings for substantial evidence," deferring to the trier of fact on questions of witness credibility, conflicting testimony, and persuasiveness of the evidence. In re Knight, 178 Wn. App. 929, 936-37, 317 P.3d 1068 (2014); In re Marriage of Rideout, 150 Wn.2d 337, 351, 77 P.3d 1174 (2003). "Evidence is substantial if it is sufficient to persuade a fair-minded, rational person of the declared premise." Merriman v. Cokeley, 168 Wn.2d 627, 631, 230 P.3d 162 (2010). Findings may be supported by substantial evidence even if there is conflicting evidence. Id.

P.T.

Todd contends the court failed to enter a written finding that his physical punishment of P.T. was "immoderate, unreasonable, or excessive" under RCW 9A.16.100.[3] He further contends that, absent such finding, there was insufficient evidence he committed an act of domestic violence against P.T. The record does not support either argument.

RCW 9A.16.100 provides

> It is the policy of this state to protect children from assault and abuse and to encourage parents, teachers, and their authorized

---

[3] Holly argues we should decline to reach the merits of the trial court's decision because Todd did not provide a sufficient record pursuant to RAP 9.2(b). Because we have the transcript of the initial DVPO hearing before the commissioner, the commissioner's oral and written ruling, and the superior court's written findings, the record before us is adequate to address Todd's argument.

agents to use methods of correction and restraint of children that are not dangerous to the children. However, the physical discipline of a child is not unlawful when it is reasonable and moderate and is inflicted by a parent, teacher, or guardian for purposes of restraining or correcting the child.

The following actions are presumed unreasonable when used to correct or restrain a child: . . . (2) striking a child with a closed fist; . . . The age, size, and condition of the child and the location of the injury shall be considered when determining whether the bodily harm is reasonable or moderate. This list is illustrative of unreasonable actions and is not intended to be exclusive.

When analyzing whether someone acted outside the safe harbor created by RCW 9A.16.100, the trial court "must consider all of the circumstances of the physical discipline, and determine whether it was objectively excessive, immoderate, or unreasonable." Ugolini, 11 Wn. App. 2d at 448. A court abuses its discretion if it concludes that any physical discipline by a parent constitutes domestic violence if it does so without analyzing the factors set out in the safe harbor statute. Id. at 449.

Based on the record before us, it is questionable whether Todd actually struck P.T. to discipline him. One could reasonably conclude Todd hit him out of anger, rather than to "correct" what Todd perceived as misconduct. But Todd's contention that the court did not consider the RCW 9A.16.100 factors or explicitly find his closed-fist discipline to be unreasonable is not well-founded.

The court reviewed the DVPO hearing and adopted the commissioner's findings. The commissioner specifically cited RCW 9A.16.100 and identified the question under this statute was whether Todd's corporal punishment was reasonable under the circumstances. The commissioner correctly stated that striking a child with a closed fist is presumptively unreasonable. After weighing the

different accounts of what happened, the commissioner found P.T.'s version of events credible, because "whatever [P.T.] disclosed was enough for two intakes to come in from two different mandated reporters" and caused [E.T.] to report that she did not feel safe with Todd. The superior court, on revision, explicitly found that Todd "punched the child in the leg with a closed fist." It went on to affirm the issuance of the DVPO for the protection of P.T. The only reasonable interpretation of the superior court's ruling is that it found Todd's decision to strike P.T. with a closed fist during a heated argument in the car to be unreasonable discipline under RCW 9A.16.100 and an act of domestic violence under RCW 26.50.010(3).

E.T.

Next, Todd contends there is insufficient evidence supporting the entry of a DVPO protecting his daughter, E.T., because there was no evidence he committed any act of domestic violence against her. We reject this argument.

Domestic violence includes "[p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury or assault, sexual assault, or stalking" between intimate partners or family or household members. RCW 26.50.010(3). But domestic violence is not limited to direct threats of physical harm and extends to a child witnessing assaults on other family members. In re Marriage of Stewart, this court examined what kind of harm is required for a finding of domestic violence. 133 Wn. App. 545, 550-51, 137 P.3d 25 (2006). In that case, two young children were exposed to repeated incidents of their father physically assaulting their mother. The trial court entered a protection order for the protection of the children. Id. at 549. On appeal, we concluded that a child's fear for a parent

- 13 -

brought about by witnessing one parent assault the other is a psychological harm that qualifies as domestic violence and is a statutory basis for a protection order. Id. at 551.

Todd cites to E.T.'s statements to CPS that "she did not think she would be physically harmed by her father." But immediately preceding that statement, E.T. reported "she did not feel safe with [her] father." In Rodriguez v. Zavala, 188 Wn.2d 586, 596, 398 P.3d 1071 (2017), our Supreme Court clearly held that "exposure to domestic violence is harmful under the DVPA. The harm caused by domestic violence can be physical or psychological." Id. By yelling and screaming profanities at E.T. and P.T., by denigrating their mother, and then by punching P.T. in front of E.T. for the ostensible purpose of "disciplining" him for mouthing off, Todd exposed E.T. to the "simpler, more insidious method of inflicting harm." Id. at 597.

While E.T. may "think" Todd would not punch her, it appears he has planted the seeds of doubt in this young, impressionable teenage mind. As in Stewart, E.T. became fearful of her father when she observed his aggression and violence against her family members. These facts support the superior court's finding that E.T. was the victim of Todd's domestic violence, justifying her inclusion in the scope of the DVPO.

Holly

Finally, Todd contends there is insufficient evidence supporting a finding of domestic violence against Holly. He maintains he did not threaten Holly with bodily harm in the November 14 phone call and, at most, he threatened to embarrass her

at work, an act that does not support a finding of domestic violence. But Todd is effectively asking this court to reweigh evidence. This we will not do.

The totality of the evidence supports the superior court's finding of domestic violence against Holly. There was a clear escalation in Todd's anger and animosity towards Holly for divorcing him. Holly had been receiving threatening text messages that she had not experienced before, and Todd sent Holly a number of alarming profanity-laced e-mails, expressing his bitterness toward her and calling her "evil." He told Holly the children were "rude entitled little shits" and that he would "NOT put up with it." He also repeatedly called Holly vulgar names to her directly and in front of their children and told Holly he "can't help" but share with the kids how mad he was at her. In addition to his alarming language, he then sent Holly an envelope full of torn up family photos, punched their son in the leg, and told her "I'll come down there and I'll fuck you up so bad with fucking your little Nordstrom bullshit." The superior court reasonably found, from the totality of this evidence, that any reasonable person subjected to this series of events would become afraid for their physical safety.

The record also supports a finding that Holly was afraid. As Todd's behavior escalated, she took several safety precautions, including reporting to her employer's human resources department and security staff that he was a possible threat, purchasing home security and pepper spray, developing a safety plan with her kids when they stayed with Todd, and having friends stay with her when she served her petition and temporary DVPO on Todd.

Although Todd did not physically assault Holly, she was clearly afraid he would act out physically against her based on his past act of violence towards P.T. The intention of the legislature in enacting chapter 26.50 RCW was to prevent domestic violence and, therefore, "[w]e refuse to construe the law so as to require [a petitioner] wait until [the perpetrator] commits further acts of violence . . . in order to seek an order for protection." See Muma v. Muma, 115 Wn. App. 1, 7, 60 P.3d 592 (2002).

There is substantial evidence supporting the findings of domestic violence against P.T., E.T., and Holly, and the superior court did not abuse its discretion in entering the DVPO and denying the motion to revise it.

C. Attorney Fees

Finally, Todd contends the commissioner erred in awarding attorney fees to Holly because the court improperly issued the DVPO. Under RCW 26.50.060(1)(g), the court has the discretion to require a respondent in a DVPO proceeding to pay reasonable attorneys' fees. The commissioner stated at the conclusion of the DVPO hearing that it was "inclined to grant attorney's fees when they're being requested." The commissioner reserved on the amount to be awarded, but indicated "I will be awarding some fees." Thereafter, Holly filed a motion for an award of attorney fees to which Todd responded. The record before us contains no order granting or denying Holly's requested fees. But because we conclude the court did not err in issuing the DVPO, there is no apparent abuse of discretion in awarding Holly fees under RCW 26.50.060(1)(g).

Holly requests attorneys' fees for this appeal. Because Holly is the prevailing party, we exercise our discretion under RCW 26.50.060(1)(g) and grant her request for reasonable attorney fees and costs on appeal subject to her compliance with RAP 18.1.

We affirm.

_Andrus, A.C.J._

WE CONCUR:

_Coburn, J._      _Chun, J._