# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　　　　Respondent,<br><br>　　v.<br><br>MARIO LAMONT HARRIS,<br><br>　　　　　　　Appellant. | DIVISION ONE<br><br>No. 78593-1-I<br><br>UNPUBLISHED OPINION<br><br>FILED: March 9, 2020 |

DWYER, J. — Mario Lamont Harris was charged with two counts of extortion in the first degree, one count of assault in the third degree, and two counts of tampering with a witness. After a jury trial, he was convicted on all counts. On appeal, he avers that insufficient evidence supports his conviction on the first count of extortion, that the jury did not receive a required unanimity instruction on that extortion charge, and that prosecutorial misconduct influenced the jury's verdict. He advances other arguments in a statement of additional grounds. While all of these challenges to his conviction are meritless, we nevertheless remand for resentencing due to an error in the calculation of Harris's offender score.

I

On January 16, 2018, 41-year-old Mario Harris approached 18-year-old Natalia Stern while Natalia was walking on Seattle's Aurora Avenue North and

offered her methamphetamines.[1] At this time, Natalia was addicted to both methamphetamines and heroin and supported herself through prostitution. Natalia accepted Harris's offer and traveled with him to his residence, a tent in the Northgate neighborhood. Once there, the two smoked methamphetamine and Harris asked for Natalia's cellular telephone to deactivate its location tracking feature. Harris never returned Natalia's phone.

Natalia stayed the night in Harris's tent and continued pressing for the return of her telephone, to no avail. After Harris cooked a meal for the two, he fell asleep and Natalia cleaned up the tent. At some point, Harris arose and began accusing Natalia of stealing methamphetamine. Although Natalia promptly showed Harris that his intact supply of methamphetamine was in the tent, Harris nevertheless struck Natalia's face with his hand, causing her immense jaw pain, and then pointed a firearm directly at her forehead. Following this, Harris escorted Natalia to a restaurant where he attempted to prostitute her to a group of three men. Natalia, rattled by this series of events, ran away without recovering her telephone. She did not have any further contact with Harris.

Natalia's parents, Jeff and Kylie Stern, were estranged from their daughter at the time and were unaware of these events. On January 17, 2018, Kylie attempted to telephone Natalia for unrelated reasons. Harris, still in possession of the telephone, answered the call but ended it immediately. Harris then called

---

[1] Natalia Stern and her parents are referred to by their given names throughout this opinion to avoid confusion. No disrespect is intended.

Kylie, introduced himself as "Lamotie," and informed Kylie that he knew Natalia and that Natalia was "with a bad man."

The narrative related by Harris was that this "bad man" was holding onto Natalia's personal computer as collateral and Natalia would not leave him until he returned it. Kylie stated that she did not care about the computer but would give money if it would facilitate Natalia's safe return. Kylie then contacted Jeff about the apparent turn of events, leading Jeff to call Natalia's telephone. The telephone was, again, answered by Harris, who identified himself as "Lamotie" or "L." Harris, or "Lamotie," claimed to be the "boss of everybody" in the north Seattle underworld and told Jeff, "We've got your daughter and we can help you get her back." Harris went on to intimate that Natalia was on the streets, was being held against her will, and was being forced into prostitution. Harris also stated that he, and only he, could assist Jeff with the return of Natalia, her telephone, and her computer.

Harris went on to state that, were Jeff to produce $1,000 as payment for the computer and the telephone, he could return those items along with Natalia herself. Jeff, desperate to ensure his daughter's safety and well-being, arranged to meet "Lamotie," drew $1,500 out of his bank account and drove to the meeting spot, a supermarket in the Greenwood neighborhood. Harris had assured Jeff that he would transport him to the person who was holding Natalia to facilitate the exchange.

At around 8:00 p.m. that evening, Harris rode in a pickup truck driven by an unknown woman to the University District. There, he recruited Dario Meguire,

a vagrant and a person known to Harris, to assist in a "lick"—a slang term for an illegal job. The two then rode in the truck to the pre-arranged meeting point. As they traveled, Harris informed Meguire of some of the plan's particulars: Harris gave Meguire Natalia's telephone to communicate with Jeff and instructed him to meet Jeff in the parking lot, obtain the sum of money, and return it to Harris. Meguire did not ask for further details on the nature of this scheme.

While en route to the meeting point, Jeff called his daughter's telephone and Meguire answered. While he was surprised to hear a voice other than Harris's, Jeff gave Meguire a description of his appearance to facilitate meeting in the supermarket parking lot. Upon their first encounter, Jeff noticed Meguire's large neck tattoo. When Jeff referred to a "Lamotie" or "L" character, Meguire did not know who he was talking about. Jeff spurned Meguire's offer to return the telephone, telling Meguire that he only wanted his daughter. Although Meguire was apparently unaware that Jeff's daughter existed, let alone that she was a part of Harris's scheme, he told Jeff that he would return his daughter for $1,500. Jeff gave Meguire $500 and told him that he would receive the rest of the money when his daughter was returned.

When Meguire returned to the pickup truck with the $500, Harris stated that it was an insufficient sum and sent Meguire back to "make it right." Meguire returned to Jeff about 20 minutes later, claiming that his life was threatened when he attempted to retrieve Natalia without tendering the entire sum demanded. Meguire informed Jeff that his daughter was not harmed and "that if [Jeff] gives me the money, he gets the girl." While Jeff tendered $500 more, he held

4

Meguire's wallet as collateral. Meguire brought this additional money to Harris and rode away with him in the truck. Neither man had any further contact with Jeff.

Jeff waited for about 20 more minutes and then telephoned the police, telling them that his daughter had been kidnapped. Jeff told the police of his belief that "Lamotie" knew a lot about his daughter, that Natalia's telephone and computer were being held along with Natalia herself, and that "Lamotie" and his accomplice, after presenting as potentially helpful, had taken his money without returning any of these things.

When the police arrived at the supermarket parking lot, they met Jeff, who recounted the events of that day, described Meguire's appearance and neck tattoo, and turned over Meguire's wallet. Jeff then returned home. The next day, Natalia, unaware of any of these events, sent Jeff a text message from a friend's telephone to inform Jeff that her own telephone had been stolen. Detective Donna Stangeland of the Seattle Police Department then arranged to meet Natalia at the same supermarket parking lot where Jeff had met Meguire the day before. Natalia described Harris's appearance and his actions. Stangeland obtained a surveillance video of the supermarket parking lot from the store's manager.

Stangeland also inspected Meguire's wallet and noticed that the first name "Dario" had been written on it. Thus, she searched for that name in King County's booking records. She was quickly able to identify Meguire due to his distinctive neck tattoo and immediately issued a bulletin for Seattle police officers

to locate him. She also shared a montage of photographs with Jeff, who identified Meguire as the man he had encountered.

When Meguire was located and brought to Stangeland for questioning, he confessed to participating in the scheme and identified Harris by viewing a Facebook profile. Stangeland found that Harris had multiple Facebook profiles, including one that identified him by his middle name, Lamont. Finally, on January 25, 2018, police located and arrested Harris. When he was interviewed by Stangeland, Harris denied ever having possessed Natalia's phone or speaking to her father. After Stangeland mentioned that she had spoken with Meguire, Harris recanted his statement and admitted to having been with Natalia and having spoken with both of her parents. He continued to maintain that he was only trying to help Jeff and Kylie by giving their money to a pimp at a nearby motel—a pimp who, after some investigation, Stangeland determined not to have been involved at all.

While in the county jail, Harris telephoned another associate, "Whitey" Asher, and asked him to find Meguire and induce Meguire's recantation of what he had told the police. While Asher did approach Meguire, he was unsuccessful in his pursuit of the recantation. Harris also independently telephoned Savannah Barios, a woman who his cellmate had been charged with assaulting, urging her to recant her statements incriminating the cellmate. He also called his own family to direct them to contact Barios and inform her that the cellmate would be beaten if Barios did not deposit $10 in Harris's jail account.

Harris was initially charged with extortion in the first degree and assault in the third degree. Because of his conduct after his arrest, the information was amended to add a second charge of extortion in the first degree and two charges of witness tampering. Harris chose to represent himself at his jury trial and, in his summation, claimed that he never threatened Natalia, and that Meguire and Natalia were to blame for the crimes with which he was charged. The jury convicted Harris on all five counts.

The court imposed upon Harris a sentence totaling 90 months of confinement. Its sentence was based upon Harris's offender score, which in turn was based upon prior convictions for which the State did not provide complete documentation. Harris appeals.

II

Harris first argues that insufficient evidence supported his conviction on the first count of extortion in the first degree. Given that abundant evidence supports the jury's determination that Harris knowingly obtained Jeff's property through a direct threat that his daughter would be held against her will unless a payment was made, Harris's challenge has no merit.

The due process clauses of the federal and state constitutions require that the State prove every element of a crime beyond a reasonable doubt. Apprendi v. New Jersey, 530 U.S. 466, 476-77, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000); U.S. CONST. amend. XIV, § 1; WASH. CONST. art. I, § 3. "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding

of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319. "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "In determining the sufficiency of the evidence, circumstantial evidence is not to be considered any less reliable than direct evidence." State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

RCW 9A.56.110 defines extortion as "knowingly to obtain or attempt to obtain by threat property or services of the owner." "A person is guilty of extortion in the first degree if he or she commits extortion by means of a threat as defined in RCW 9A.04.110[(28)](a), (b), or (c)." RCW 9A.56.120. In pertinent part, RCW 9A.04.110(28) states as follows:

> "Threat" means to communicate, directly or indirectly the intent:
> . . .
> (c) To subject the person threatened or any other person to physical confinement or restraint.

Whether a statement is a "true threat" is determined through an objective standard that focuses on the speaker. State v. Kilburn, 151 Wn.2d 36, 44, 84 P.3d 1215 (2004). "The question is whether a reasonable person in the speaker's position would foresee that the threat would be interpreted as a serious expression of intention to inflict the harm threatened." State v. Kohonen, 192 Wn. App. 567, 575-76, 370 P.3d 16 (2016) (citing State v. Allen, 176 Wn.2d 611,

626, 294 P.3d 679 (2013)). "A true threat is a serious threat, not one said in jest, idle talk, or political argument." Kilburn, 151 Wn.2d at 43.

Construing the evidence in the light most favorable to the State, a reasonable juror could conclude beyond a reasonable doubt that Harris, personally, communicated to Jeff the serious threat that he would subject, or allow a third person to subject, Natalia to confinement or restraint unless Jeff tendered $1,000 to Harris.

Jeff testified that Harris told him, "We've got your daughter and we can help you get her back." Jeff also testified that Harris stated Natalia was being held against her will, was in danger, and was being forced into prostitution. While he claimed that Natalia was actually being held by a nonexistent third person, Harris claimed to "run this area" and to be the "boss of everybody" who had the sole power to free Natalia from confinement, telling Jeff directly: "You know, only I can take care of this."

Harris, for his part, argues that no evidence of a "true threat" existed because "Jeff and Kylie did not believe Harris was threatening to confine or restrain their daughter." This argument disregards the language of RCW 9A.04.110(28)(c). The State was required only to prove that Harris threatened to subject Natalia to continued confinement by declining to intervene, when he purportedly had the sole power to do so, unless he received a payment of $1,000.

The evidence adduced by the State clearly showed that a reasonable person in Harris's position would foresee his statements being interpreted as a

serious expression of intent to inflict continued harm on Natalia through her confinement. Jeff was led, through Harris's actions, to believe that Harris and Meguire were somehow involved with Natalia's restraint. Again, Harris's claim of insufficiency admits the truth of all of the State's evidence, including Jeff's testimony.

Next, Harris asserts that Meguire's statements to Jeff about paying money to "get the girl" shows that Harris lacked any knowledge of Meguire's threats. However, Meguire's statements were prompted by Jeff's statement that he expected the safe return of his daughter in exchange for the money. Meguire, in fact, knew nothing about the involvement of Jeff's daughter until Jeff introduced the subject. Jeff only formed this belief about a quid pro quo exchange after Harris first suggested it. Thus, again, viewing the evidence in the light most favorable to the State, the jury could find that Harris communicated the threat to Jeff. The evidence was not of a type that could only be viewed as an offer of help that somehow mutated into a threat through Meguire's misapprehension of the situation, as suggested by Harris on appeal.

Ample evidence supported Harris's conviction for extortion in the first degree. All of Harris's arguments to the contrary would have us view the evidence in the light most favorable to himself and not to the State. His challenge to its evidentiary sufficiency fails.

III

Next, Harris contends that the trial court erred by not instructing the jury that its verdict must be unanimous as to the acts constituting the charged offense

of the extortion of Jeff. This is so, Harris asserts, because there were multiple alleged acts of extortion and the State did not make an election as to the specific acts on which it relied to prove this charge. According to Harris, this permitted the jury, in the absence of a unanimity instruction, to reach a guilty verdict without a unanimous agreement as to the specific acts constituting the charged offenses. This assertion fails because Harris's various acts of indirectly and directly threatening Jeff constituted a single, continuous course of conduct.

To protect a criminal defendant's right to be convicted only when found guilty beyond a reasonable doubt, the jury must be unanimous as to the act constituting the crime charged. State v. Petrich, 101 Wn.2d 566, 569, 683 P.2d 173 (1984), overruled on other grounds by, State v. Kitchen, 110 Wn.2d 403, 405-06, 756 P.2d 105 (1988). "When the prosecution presents evidence of multiple acts of like misconduct, any one of which could form the basis of a count charged, either the State must elect which of such acts is relied upon for a conviction or the court must instruct the jury to agree on a specific criminal act." State v. Coleman, 159 Wn.2d 509, 511, 150 P.3d 1126 (2007). An election by the State need not be formally pled or incorporated into the information. State v. Carson, 184 Wn.2d 207, 227, 357 P.3d 1064 (2015). As long as the election clearly identifies the particular acts on which charges are based, verbally informing the jury of the election during closing argument is sufficient. Carson, 184 Wn.2d at 227. Whether or not a unanimity instruction was required in a particular case is a question of law reviewed de novo.[2] State v. Boyd, 137 Wn.

---

[2] Failure to provide a required unanimity instruction affects a defendant's constitutional right to a jury trial, and may be raised for the first time on appeal. RAP 2.5(a)(3); State v. Hanson, 59

App. 910, 922, 155 P.3d 188 (2007).

However, no election or unanimity instruction is required when the evidence presented indicates that a defendant's actions constituted a "'continuing course of conduct.'" State v. Handran, 113 Wn.2d 11, 17, 775 P.2d 453 (1989) (quoting Petrich, 101 Wn.2d at 571). We use common sense to determine whether criminal conduct constitutes one continuing course of conduct or several distinct acts. Handran, 113 Wn.2d at 17. We evaluate whether the evidence shows conduct occurring at one place or at several places, within a brief or long period of time, involving one or multiple different victims, and whether the conduct was intended to achieve a single or multiple different objectives. See, e.g., State v. Crane, 116 Wn.2d 315, 330, 804 P.2d 10 (1991) ("We believe the appropriate analysis is to apply the 'continuous conduct' exception to the time between 3 and 5 p.m. on May 15 (the most logical period of time when the fatal injuries were inflicted)."); Handran, 113 Wn.2d at 17 ("[W]here the evidence involves conduct at different times and places, then the evidence tends to show 'several distinct acts.'"); State v. Love, 80 Wn. App. 357, 361, 908 P.2d 395 (1996) (differing victims and objectives show distinct acts, not a continuous course of conduct).

A continuing offense may exist even when it takes place over a long period. Thus, in State v. Knutz, 161 Wn. App. 395, 253 P.3d 437 (2011), Division Two of this court held that the defendant was not entitled to a unanimity instruction because her numerous acts of fraud constituted a continuing course

Wn. App. 651, 659, 800 P.2d 1124 (1990) (citing State v. Camarillo, 115 Wn.2d 60, 64, 794 P.2d 850 (1990); State v. Kitchen, 110 Wn.2d 403, 409, 756 P.2d 105 (1988)).

of conduct. Therein, Knutz fraudulently obtained cash loans from a retired professor over a period of 29 months, offering various fabricated purposes for each loan. Knutz, 161 Wn. App. at 399. Knutz averred that the trial court erred in not providing a unanimity instruction because the State relied "'on multiple acts occurring over the course of three years to establish'" theft. Knutz, 161 Wn. App. at 406. Division Two affirmed the conviction because the defendant used her victim "'to promote an enterprise with a single objective'—to obtain money through deceit." Knutz, 161 Wn. App. at 409 (quoting State v. Barrington, 52 Wn. App. 478, 481, 761 P.2d 632 (1988)). The court concluded that the defendant's acts were a continuing course of conduct.

Similarly, Harris's series of threats, assertions, promises and outright fabrications, as communicated to Jeff, were part of a single, continuous course of conduct all directed towards one objective: receiving money from Jeff. These communications all occurred within a single day, took place through telephone calls made from the same device, and were made as part of a single narrative concocted by Harris and calculated to exploit Jeff's worst fears. The mere loquacity of this narrative does not render it divisible into separate and distinct acts of extortion.

Nor does the involvement of Meguire as an accomplice alter this analysis. As Harris had recruited Meguire to be his accomplice and had briefed him—if incompletely—on the manner and form of the "lick," as well as the objective, Harris was accountable for Meguire's actions. His threats to Jeff regarding the

13

treatment of his daughter were prompted by Jeff referencing Harris's words. Meguire's threats were part and parcel of Harris's extortion scheme.

Given that Harris's threats were all directed at the same victim, occurred within a single day's span, and occurred for the single purpose of extorting Jeff, Harris's acts were plainly a continuous course of conduct. No election or unanimity instruction was required.

IV

Next, Harris alleges that a statement by the prosecutor during the State's closing argument misstated the State's burden of proof, and that this prosecutorial misconduct fatally undermined his right to a fair trial. While he is correct that the prosecutor's remark was improper, he did not object to the remark at trial and cannot show, on appeal, that he was prejudiced thereby.

A defendant alleging improper argument by the State bears the burden of proving that the prosecutor's conduct was both improper and prejudicial. State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). Once a defendant establishes that a prosecutor's statements were improper, the appellate court determines whether the defendant is entitled to relief by applying one of two standards of review. Emery, 174 Wn.2d at 760. The first standard, which applies if the defendant timely objected at trial and the objection was overruled, requires that the defendant show that the prosecutor's misconduct led to prejudice that had a substantial likelihood of affecting the jury's verdict. Emery, 174 Wn.2d at 760.

The second standard applies if the defendant did not object at trial. In that event, the defendant is deemed to have waived the claim of error unless the defendant can show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" Emery, 174 Wn.2d at 761 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

The trial court's jury instruction 3 was based on the language of 11 Washington Pattern Jury Instructions: Criminal 4.01 (4th ed. 2016) (WPIC) and stated, in pertinent part:

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

Jury Instruction 3.

In her closing argument, however, the prosecutor stated the following:

> The jury instructions tell you that "beyond a reasonable doubt" is a doubt that would exist in the mind of a reasonable person after fully, fairly and carefully considering the evidence and that it's a doubt for which a reason exists. So it can't just be any wild doubt; you have to actually attach a reason to it.

Harris did not object to this statement.

In State v. Bennett, 161 Wn.2d 303, 318, 165 P.3d 1241 (2007), our Supreme Court instructed Washington trial courts to use only the approved pattern instruction WPIC 4.01 to instruct juries that the government has the burden of proving every element of the crime beyond a reasonable doubt. The Supreme Court has drawn a distinction, however, between this definition of a

reasonable doubt—"'one for which a reason exists'"—and a definition that "require[s] that a reason be given for a juror's doubt." State v. Kalebaugh, 183 Wn.2d 578, 581, 585, 355 P.3d 253 (2015) (quoting WPIC 4.01). The latter definition is erroneous, the court has held, because it "improperly implies that the jury must be able to articulate its reasonable doubt" and "subtly shifts the burden to the defense." Emery, 174 Wn.2d at 760.

Here, the prosecutor's statement to the jurors that "you have to actually attach a reason to [the doubt]" was similarly misleading. "[T]he law does not require that a reason be given for a juror's doubt." Kalebaugh, 183 Wn.2d at 585. "[A] jury need do nothing to find a defendant not guilty." Emery, 174 Wn.2d at 759-60. However, because Harris did not object to the prosecutor's remark at trial, it does not warrant reversal unless, as previously stated, "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" Emery, 174 Wn.2d at 761. The remark complained of here satisfies neither prong of this two-prong test.

In several of the cases on which Harris relies, courts that held an improper "fill-in-the-blank" arguments akin to that which Harris complains of here were capable of remedy through a curative instruction and caused no perceptible prejudice. See, e.g. Emery, 174 Wn.2d at 764 ("If either [defendant] had objected at trial, the court could have properly explained the jury's role and reiterated that the State bears the burden of proof and the defendant bears no burden."); State v. Anderson, 153 Wn. App. 417, 431-32, 220 P.3d 1273 (2009)

("Anderson failed to object below and has failed to demonstrate that these comments were so flagrant or ill intentioned that an instruction could not have cured the prejudice."); Kalebaugh, 183 Wn.2d at 586 ("Jurors are presumed to follow the court's instructions, and Kalebaugh does not provide any facts to rebut this presumption. The judge's correct instructions given throughout the case cured any potential prejudice that could have possibly arisen." (citations omitted)).

Here, Harris has not provided any substantive argument as to why the prosecutor's misstatement was incurable by a jury instruction, or to rebut the sundry opinions of this court and of the Supreme Court that have held otherwise. Nor can he show prejudice. The jury received an instruction setting forth the correct standard of proof. "The jury is presumed to follow the court's instructions." State v. Imhoff, 78 Wn. App. 349, 351, 898 P.2d 852 (1995) (citing State v. Grisby, 97 Wn.2d 493, 499, 647 P.2d 6 (1982)). "A defendant has no entitlement to the luck of a lawless decisionmaker." Strickland v. Washington, 466 U.S. 668, 695, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The likelihood of prejudice is particularly minimal when, as discussed above, abundant evidence supports Harris's conviction. The prosecutor's remark, improper as it was, was not objected to at trial and does not now warrant reversal.

V

Harris raises further issues for our review in a statement of additional grounds. Each of his arguments is devoid of merit. His principal contention is that his constitutional right to confront witnesses against him was violated when

17

he was charged with the extortion of Savannah Barios and tampering with her role as a witness in an unrelated proceeding. Harris raised this issue at trial. We review his confrontation clause challenge de novo. State v. O'Cain, 169 Wn. App. 228, 234 n.4, 279 P.3d 926 (2012).

The confrontation clause of the Sixth Amendment to the United States Constitution guarantees an accused the right to confront the witnesses against him. U.S. CONST. amend. VI; Crawford v. Washington, 541 U.S. 36, 42, 51, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). This right, which applies to the states via the Fourteenth Amendment's due process clause, necessarily speaks to a defendant's right to cross-examine adverse witnesses. Pointer v. Texas, 380 U.S. 400, 404-05, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965). The right of confrontation is the guarantee of an opportunity to cross-examine the witness. United States v. Owens, 484 U.S. 554, 559, 108 S. Ct. 838, 98 L. Ed. 2d 951 (1988).

Modern confrontation clause analysis is driven by Crawford. Therein, the Supreme Court concluded that the right of confrontation extended only to "witnesses" who "bear testimony" against the accused. Crawford, 541 U.S. at 51. No such testimony was borne by Barios in this case. In fact, in prosecuting Harris on the charges of extorting Barios and tampering with her as a witness, the State relied entirely on statements made by Harris himself in telephone calls he made to her from jail. Transcripts of these calls were made available to the jury as exhibits. Because the State did not rely on, or even introduce, any

18

testimonial statement from Barios, Harris's confrontation clause rights were plainly not violated.

Harris's plethora of other arguments contained in his statement of additional grounds are all predicated on alleged inconsistencies or untruths in the testimony of other witnesses. "Credibility determinations are reserved for the trier of fact, and an appellate court 'must defer to the [trier of fact] on issues of conflicting testimony, credibility of witnesses, and persuasiveness of the evidence.'" State v. Rafay, 168 Wn. App. 734, 843, 285 P.3d 83 (2012) (alteration in original) (quoting State v. Liden, 138 Wn. App. 110, 117, 156 P.3d 259 (2007)). We will not re-weigh the evidence on appeal.

VI

Finally, Harris assigns error to the court's imposition of a sentence based on an offender score that the court accepted without receiving complete documentation of his prior convictions. The State concedes this error.

The State has the burden of proving a defendant's criminal history by a preponderance of the evidence. State v. Mendoza, 165 Wn.2d 913, 920, 205 P.3d 113 (2009). The remedy when this does not take place is reversal and remand for resentencing. State v. Ramirez, 190 Wn. App. 731, 735, 359 P.3d 929 (2015). Accordingly, while we affirm Harris's conviction, we accept the State's concession and, therefore, reverse his sentence and remand for resentencing.

Affirmed in part, reversed in part, and remanded.

WE CONCUR: