IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37693-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| APOLLO GENE WARNOCK, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Apollo Warnock appeals his conviction for cyberstalking, after a

bench trial, on insufficiency of evidence, statutory construction, and constitutional

grounds. We affirm his one conviction.

FACTS

This prosecution arises from e-mails sent by Apollo Warnock, then a resident of

the Asotin County jail, to his sister, Mica Cato, on April 18, 2020. Warnock had

previously assaulted his sister. Recently, however, the two had maintained limited, but

civil, communications while Warnock sat in jail on burglary charges. Warnock lacked

funds for bail.

On March 30, 2020, Apollo Warnock's and Mica Cato's mother died. On the

evening of April 18, 2020, Apollo Warnock sent his sister, Mica Cato, five e-mails,

through the Asotin County jail's monitored e-mail system, about inheritance from the

mother. We quote the e-mails in their original spelling, punctuation, and grammar.

At 7:13 p.m., Warnock sent the following transmission to Cato:

Subject: fucked up brother

dont get ahead of yourself you think you inherited that property and your wrong. thats my property, you try to take my moms legacy and i promise the results wont be good. you keep fucking running your mouth about my moms stuff and ill *fucking murder you over my moms legacy. . . ha ha just kidding. . . not*.

Clerk's Papers (CP) at 3-4 (emphasis added) (alteration in original). At 7:40 p.m., Apollo

Warnock sent a second e-mail to Mica Cato:

Subject: my house

you think that was a wise move to remove me from the will while my mom was to weak to discuss it. well your wrong, i know what mom wanted and connie isnt an even split connie gets 10% because thats what mom told me, but you should consider something that i can be a best friend or a worst nightmare its up to you how you want to play it because i have no conscience at all when it comes tomy mom. you want to fucking make a friend bail me out you want to make an enemy say you inherited that property one more time. *i will fucking take you, josh your kid, my dog right to the gates of heaven with mom*

CP at 5-6 (emphasis added).

Mica Cato responded to Apollo Warnock's second e-mail:

Subject: No contact from now on.

I take threats to the safety of me and my family very seriously. Do not contact me again. We are definitely done now. I will not be replying to

2

any more emails, or answering any more calls.  I will not live my life in fear of you anymore.

CP at 13-14.

At 7:56 p.m., Apollo Warnock sent his sister a third e-mail, reading:

Subject: boo

i guess ill be seeing you when i get out

CP at 7-8.  Two minutes later, Warnock e-mailed Mica Cato a fourth time:

Subject: theft

*im going to kill you*

CP at 9-10 (emphasis added).  At 8:31 p.m., on April 18, 2020, Apollo Warnock sent a

fifth and final message to Mica Cato from the jail:

Subject: mistakes

my plan was to get bailed and go right to work to pay off everyone i owe and then pay my moms truck and property and be there for you and live right.  now i guess ill be spending the rest of my life behind bars.  so I just want to say this. . . i wish i never had you for a sister

CP at 11-12 (alteration in original).

Mica Cato testified, during trial, that she believed Apollo Warnock capable of

executing his threat to kill her.  Her belief and fear stemmed from Warnock's previous

assault on her and his reputation as unpredictable.  Because Warnock had friends that

lived near Cato, she feared, despite Warnock then residing in jail, that he would task one

of the friends with injuring her.

On April 19, 2020, Deputy Ashlee Bremer, Asotin County jail corrections officer, reviewed the five e-mails Apollo Warnock transmitted to Mica Cato. Also on April 19, Cato requested the jail for protection from her brother. Asotin County Sheriff Deputy Joe Snyder spoke with Mica Cato over the phone. According to Deputy Snyder, Cato expressed a belief and fear that Warnock would execute his threat. Cato informed Snyder that Warnock had physically hurt her in the past and that they shared an "up and down" relationship. CP at 1.

## PROCEDURE

The State of Washington charged Apollo Warnock with one count each of cyberstalking and harassment arising from threats to kill Mica Cato. The matter proceeded to a bench trial.

During trial, while reviewing printouts of the e-mails that Apollo Warnock sent her, Mica Cato's hands visibly shook. When asked by the prosecutor whether her hands normally shook, Cato responded that they did not.

The trial court acquitted Apollo Warnock of harassment based on a finding that a reasonable person, with the background of Mica Cato, would discount the e-mail as statements uttered in the heat of emotion and without intent to harm. The crime of harassment requires proof of "reasonable fear" in the mind of the recipient of the threat. RCW 9A.46.020(1)(b).

Conversely, the trial court found Apollo Warnock guilty of cyberstalking. The

4

court concluded that Warnock's e-mail to his sister constituted electronic communications made "with the intent to harass, intimidate, or torment" Mica Cato. CP at 20. In so ruling, the court refused to apply the portion of the cyberstalking statute that outlaws communications made with the intent to "embarrass." RCW 9.61.260(1).

For purposes of the charge of cyberstalking, the trial court employed an objective standard from the standpoint of the speaker, not the listener. The accused commits the crime if he should have reasonably expected that the recipient would suffer embarrassment, harassment, intimidation, or torment. The court concluded that a reasonable speaker would foresee that Warnock's statements "would be interpreted as a serious expression of intention to carry out the threat rather than a statement made in jest or mere idle talk." CP at 19-20. The court further found that Warnock intentionally directed threats to kill, which threats placed Cato, albeit unreasonably because of her background, in fear for her life.

## LAW AND ANALYSIS

Apollo Warnock challenges his conviction for cyberstalking on four grounds. First, insufficient evidence supports the conviction. Second, the trial court should have employed a subjective standard when determining whether the speaker, himself, should have expected that the recipient would deem the threat serious. Third, the cyberstalking statute, RCW 9.61.260, breaches the overbreadth doctrine under the First Amendment to

5

the United States Constitution. Fourth, the statute is void for vagueness under the First and Fourteenth Amendments. We address the challenges in such order.

## Sufficiency of Evidence

Apollo Warnock's challenge to the sufficiency of evidence implicates the "true threat" test applied when the State charges one with a crime for his or her speech. Warnock argues that, given his incarceration at the time he sent Mica Cato the five e-mails, his emotional volatility as a result of his mother's death, and the trial court's finding that his sister lacked a reasonable fear of his supposed threat, the State failed to prove that his statements constituted a "true threat" under Washington's objective standard. We disagree.

RCW 9.61.260 governs cyberstalking. The statute declares in relevant part:

> (1) A person is guilty of cyberstalking if he or she, with intent to harass, intimidate, torment, or embarrass any other person, and under circumstances not constituting telephone harassment, makes an electronic communication to such other person or a third party:
> . . . .
> (c) Threatening to inflict injury on the person or property of the person called or any member of his or her family or household.

When analyzing whether sufficient evidence supports a defendant's conviction, this court views the evidence in the light most favorable to the prosecution and determines whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt. *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). Subject to the rules governing First Amendment analysis, we draw all reasonable

6

inferences from the evidence in the State's favor and interpret the evidence most strongly

against the defendant. *State v. Locke*, 175 Wn. App. 779, 788, 307 P.3d 771 (2013).

The true threat doctrine arises from free speech jurisprudence. The First

Amendment, applicable to the states through the Fourteenth Amendment, prohibits the

government from abridging the freedom of speech. *Virginia v. Black*, 538 U.S. 343, 358,

123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003); *State v. Locke*, 175 Wn. App. 779, 789

(2013). Nevertheless, the First Amendment does not extend to unprotected speech. *State

v. Locke*, 175 Wn. App. at 789. If the speaker issues a true threat, the speech falls outside

constitutional protection. *State v. Kilburn*, 151 Wn.2d 36, 43, 84 P.3d 1215 (2004). True

threats are unprotected speech due to "[t]he fear of harm aroused in the person threatened

and the disruption that may occur as a result of that fear." *State v. Kilburn*, 151 Wn.2d at

46.

Washington courts apply an objective test from the viewpoint of the speaker to

determine whether speech constitutes a true threat:

> A true threat is a statement made in a context or under such
> circumstances wherein a reasonable person would foresee that the statement
> would be interpreted . . . as a serious expression of intention to inflict
> bodily harm upon or to take the life of another person.

*State v. Kilburn*, 151 Wn.2d 43-44 (alteration in original) (internal quotation mark

omitted). On this basis, Washington courts hold, along with a majority of other courts,

7

that the First Amendment does not require that the speaker intend to execute a threat for his remarks to constitute a true threat. *State v. Kilburn*, 151 Wn.2d at 46.

We review three Washington decisions, *State v. Kilburn*, 151 Wn.2d 36 (2004), *State v. Kohonen*, 192 Wn. App. 567, 370 P.3d 16 (2016), and *State v. Locke*, 175 Wn. App. 779 (2013), to assist in applying the true threat test. We extract from the decisions important circumstances that render the remarks of the defendant either a true threat or not a true threat. These decisions involve crimes other than cyberstalking, but the true threat test applies to the many crimes that punish speech, and Apollo Warnock employs the true threat test in his defense.

In *State v. Kilburn*, 151 Wn.2d 36 (2004), the Washington Supreme Court reversed Martin Kilburn's conviction for felony harassment after determining that his statement to a classmate, eighth-grader K.J., did not constitute a true threat. At the end of a school day, several students, including Kilburn and K.J., chatted, giggled, and laughed together. Kilburn and K.J. discussed books, including one Kilburn then held, which book depicted military men and firearms on the cover. During the conversation, Kilburn turned to K.J., half smiling, and told her that "'I'm going to bring a gun to school tomorrow and shoot everyone and start with you.'" *State v. Kilburn*, 151 Wn.2d at 39, 52. Kilburn then began giggling before saying to K.J., "'maybe not you first.'" *State v. Kilburn*, 151 Wn.2d at 39, 52. K.J. testified that Kilburn laughed and acted as if joking. K.J. averred that she felt surprised, not scared, and that Kilburn occasionally joked

around her and other students. He had always treated her politely. Although K.J. later wondered whether Kilburn was actually serious, the *Kilburn* court held, "[t]hese facts all suggest that a reasonable person in Kilburn's position would foresee that his comments would not be interpreted seriously." *State v. Kilburn*, 151 Wn.2d at 53.

In *State v. Locke*, 175 Wn. App. 779 (2013), Robert Locke e-mailed then Washington Governor Christine Gregoire via her website. In two e-mails, Locke listed his city as "'Gregoiremustdie.'" *State v. Locke*, 175 Wn. App. 779, 785 (2013). In the first e-mail, Locke wrote that he hoped Governor Gregoire would see one of her "'family members raped and murdered by a sexual predator.'" *State v. Locke*, 175 Wn. App. at 785. Locke also thanked Governor Gregoire for "'putting this state in the toilet'" and requested that she "'pull the lever to send us down before'" leaving Olympia. *State v. Locke*, 175 Wn. App. at 785.

Two minutes later, Robert Locke sent Governor Christine Gregoire a second e-mail, stating, "'You fucking CUNT!! You should be burned at the stake like any heretic.'" *State v. Locke*, 175 Wn. App. at 785. Finally, two minutes after sending the second e-mail, Locke accessed a separate section on Governor Gregoire's website, entitled "'Invite Governor Gregoire to an Event,'" and created an event request. *State v. Locke*, 175 Wn. App. at 786. In the request, Locke identified his organization as "'Gregoire Must DIe [sic],'" requested that the event be held at the Governor's Mansion, and stated the event's subject would be "'Gregoire's public execution.'" *State v. Locke*,

9

175 Wn. App. at 786. He also specified that the event would last for fifteen minutes, media would be present, and an audience of over 150 people would attend.

Governor Christine Gregoire's executive scheduler discovered Robert Locke's electronic communications. The alarmed scheduler took the threat seriously, since the communications occurred after a recent shooting of an Arizona Congresswoman. The Washington State Patrol (WSP) investigated the communications and deemed the e-mail a serious threat to harm the governor. When WSP contacted an individual matching Locke's description, the man identified himself as Locke and proclaimed: "'Yeah, I know why you're here. . . . I figured you guys would be contacting me.'" *State v. Locke*, 175 Wn. App. at 787 (alteration in original). Locke explained that he sent the electronic communications out of anger, and that, during Governor Gregoire's previous role as the attorney general, the attorney general's office failed to investigate Locke's complaint that an employer deprived him of two paychecks. Locke also expressed ire about walking three miles to physical therapy while in pain due to a back condition, which condition caused him to be unable to work. Locke profusely apologized, to the WSP, for the intimidation and claimed he had no intention of implementing the threats. Locke added that he knew about the recent Arizona shooting.

The State charged Robert Locke with one count of making threats against the governor or her family. The jury convicted Locke of the one count. The Court of Appeals affirmed.

On appeal, Robert Locke argued that insufficient evidence established that he made a true threat against Governor Christine Gregoire. This court concluded that at least one electronic communication, but not all, e-mail constituted a true threat. The first e-mail instead constituted Locke's expression of indignation over a personal grievance with the State. Although "crude and upsetting," the first communication comprised "hyperbolic political speech, predicting threatening personal consequences from the State's policies." *State v. Locke*, 175 Wn. App. at 791. The second e-mail expressed more than a desire that the governor's policies will lead to horrible consequences. This e-mail unequivocally expressed that the Governor should be killed. The third e-mail requesting an appointment for a public killing escalated the violent tone of the messages and elevated the second communication to a true threat. The request objectively expressed the desire for an execution, irrespective of Locke's subjective intent.

The Court of Appeals emphasized the current national political climate that entailed a shooting at an Arizona political gathering. This court also highlighted that Locke lacked a preexisting relationship with the governor and the lack of such relationship might cause her to take his communications seriously. The governor's staff and the WSP took the threats seriously.

The *Locke* court concluded that the evidence demonstrated:

> a rapid-fire e-mail sequence of increasing specificity and menace. If anything, the short intervals between the e-mails suggest a troubling

11

explosiveness lying behind them. That message would be taken seriously
be a reasonable person.

*State v. Locke*, 175 Wn. App. at 793.

In *State v. Kohonen*, 192 Wn. App. 567, 580 (2016), the juvenile court found J.K. guilty of cyberstalking. While in eighth grade, a classmate of J.K., S.G., reported her behavior to a teacher, resulting in J.K.'s suspension from school. Two years later, when reminded of the suspension, J.K. posted two tweets on the social media platform, Twitter. J.K.'s first tweet read, "'Tbh [To be honest] I still want to punch you in the throat even tho [sic] it was 2 years ago.'" *State v. Kohonen*, 192 Wn. App. 567, 571 (2016). The second tweet read, "'#[S.G.]mustdie.'" *State v. Kohonen*, 192 Wn. App. at 571. S.G's friend, I.R., notified J.K. of the tweets. S.G. felt angry and embarrassed, since she knew other people would see the posts, due to J.K.'s profile being viewable to the public. S.G., though not frightened, notified school authorities of the tweets.

On appeal in *State v. Kohonen*, this court reversed J.K.'s conviction, while concluding that the text of her tweets did not constitute true threats. This court drew comparisons from *State v. Locke*, finding the statement "#[S.G.]mustdie" analogous to "Gregoiremustdie." *State v. Kohonen*, 192 Wn. App. at 579. Apparently, those issuing fake threats of death do not place a space between "must" and "die." Since J.K.'s tweets merely expressed a desire for violence, the tweets did not amount to a true threat. The court highlighted that J.K. posted the alleged threats on Twitter, a platform which J.K.

12

and her peers used to express their feelings, thoughts, and reactions. This court counted

the reactions of the students who perceived the tweets, including S.G. The court wrote

that J.K.'s tweets were:

> hyperbolic expressions of frustration, and that is precisely how they
> were received. A reasonable person in J.K.'s position would not have
> anticipated a different reception.

*State v. Kohonen*, 192 Wn. App. at 583.

Unlike e-mails in *Locke* and the tweets in *Kohonen*, Apollo Warnock's electronic

communications to Mica Cato did not contain hyperbolic expressions of desire. Rather,

Warnock expressed an intent to kill Cato, stating, "ill fucking murder you over my moms

legacy. . . ha ha just kidding. . . not," in one e-mail. CP at 4 (alteration in original).

Thus, in his only attempt at humor, Warnock immediately added that he was not kidding.

He later wrote: "im going to kill you." CP at 10. In the worst of the e-mail, Warnock

told Cato that he "will fucking take you, josh your kid, my dog right to the gates of

heaven with mom." CP at 6. As in *Locke*, Warnock's electronic communications to Cato

escalated in intensity.

Apollo Warnock and Mica Cato, unlike Robert Locke and Governor Christine

Gregoire, maintained a relationship before Warnock's threats. Warnock had previously

assaulted Cato and had a reputation for being unpredictable. As a result, Cato's

preexisting relationship with Warnock contributed to her expectation of implementing his

threat, including garnering a friend to perform the task.

13

Apollo Warnock intended Mica Cato to receive his e-mails. Thus, her actual reaction provides a guide for what a reasonable reaction under the circumstances would have been, as well as what a reasonable speaker would have foreseen. *State v. Kohonen*, 192 Wn. App. 567, 580 (2016). After receiving Warnock's first two e-mails, which threatened to murder her over their mother's legacy and take her, her son, and his dog to the pearly gates, Cato responded. She told Warnock that she took his threats seriously, requested that he not contact her again, and informed him that she would not live in fear of him any longer. The following morning, after receiving an additional three e-mails from Warnock, Cato contacted the jail for assistance and cooperated with law enforcement in its investigation of the matter. Finally, at trial, Cato's hands visibly shook while holding and reviewing the printouts of Warnock's e-mails. The reaction of Cato contrasts with the response of S.G. in *Kohonen*, who testified that she felt angry and embarrassed, but not scared or convinced that J.K. would execute her threat.

Apollo Warnock maintains that he could not have reasonably foreseen that Mica Cato would interpret his threats as serious because he could not post bail and leave jail at the time he sent Cato the e-mails. This argument fails, however, to recognize that he could eventually post bail or that a friend fulfill the threat.

Apollo Warnock posits that his emotional volatility resulting from his mother's death and his otherwise normal communications with Mica Cato establish that his speech arose from frustration. Nevertheless, frustration is not a defense if Warnock should have

14

reasonably expected the listener to take the threat seriously. Furthermore, viewing the evidence in the light most favorable to the State, Warnock's elevated emotional state harms his position since the increased frustration could prompt violence.

Finally, Apollo Warnock asserts that the trial court's finding that Mica Cato did not have a reasonable fear of his threats as to the harassment charge establishes that the evidence could not prove that he made a true threat. Nevertheless, a true threat need not invoke a reasonable fear from the victim. The State need only show that a reasonable speaker would foresee that Warnock's statements would be interpreted as a serious expression of intent to harm or kill Cato.

Objective Standard and Statutory Construction

Apollo Warnock contends that Washington courts' imposition of an objective standard as to whether speech constitutes a true threat breaches the First Amendment. Warnock notes that other jurisdictions require proof that the defendant subjectively intended to induce fear of serious harm or death. He raises this issue to preserve it in the event the United States Supreme Court accepts review of the question. We take Warnock's argument as one that the First Amendment compels the court to apply a subjective standard as to whether the speaker expected the recipient to experience harassment, intimidation, or torment. Based on Washington precedent, we reject the argument.

15

As already noted, Washington adopted an objective test to determine whether speech constitutes a true threat. "A true threat is a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life of another person." *State v. Kilburn*, 151 Wn.2d 36, 43-44 (2004) (alteration in original) (internal quotation marks omitted). Under this standard, the trier of fact assesses the threat under an objective standard that focuses on the speaker. *State v. Kilburn*, 151 Wn.2d at 43-44. Washington's standard is not unique, as many jurisdictions employ an objective test for determining a true threat. *State v. Kilburn*, 151 Wn.2d at 46.

In *State v. Trey M.*, 186 Wn.2d 884, 892-93, 383 P.3d 474 (2016), our high court reaffirmed that Washington's objective standard satisfies the requirements of the First Amendment. The *Trey M.* court refused to abandon precedent by employing a subjective intent true threat standard. The court concluded that the United States Supreme Court in *Virginia v. Black*, 538 U.S. 343 (2003) did not hold that an "'intent to intimidate'" requirement must be imposed in all cases to avoid a First Amendment violation. *State v. Trey M.*, 186 Wn.2d at 900.

## Overbreadth and Vagueness

Apollo Warnock asserts that RCW 9.61.260 is constitutionally overbroad and vague. We agree with Warnock that one of the prongs of the statute is unconstitutional. RCW 9.61.260 criminalizes cyberstalking with the intent to "harass, intimidate, torment,

16

or embarrass any other person." This court previously concluded that RCW 9.61.260's criminalization of speech made with the intent to embarrass others to be unconstitutionally overbroad. *State v. Mireles*, 16 Wn. App. 2d 641, 654-55, 482 P.3d 942 (2021). Nevertheless, Warnock's trial court found Warnock to have harassed, intimidated and tormented Mica Cato. The trial court did not rely on the word "embarrass" when convicting Warnock. Based on precedent, as analyzed below, we reject the constitutional challenge to the remaining three prongs of RCW 9.61.260 applied by the trial court.

*Overbreadth*

Apollo Warnock maintains that RCW 9.61.260 is overbroad insofar as it criminalizes communications made with the intent to embarrass or harass. As already indicated, the trial court did not base its decision on embarrassment, so we do not address this half of Warnock's argument.

A law is overbroad if it "sweeps within its prohibitions" a substantial amount of constitutionally protected conduct. *State v. Immelt*, 173 Wn.2d 1, 6, 267 P.3d 305 (2011); *City of Tacoma v. Luvene*, 118 Wn.2d 826, 839, 827 P.2d 1374 (1992). The court will overturn a statute or ordinance if the court cannot place a sufficiently limiting construction on a standardless sweep of legislation. *City of Tacoma v. Luvene*, 118 Wn.2d 826, 840 (1992). "Application of the overbreadth doctrine is strong medicine, . . . and should be employed by a court sparingly and only as a last resort." *State v. Halstien*,

17

122 Wn.2d 109, 122, 857 P.2d 270 (1993). A litigant holds standing to challenge a statute as facially overbroad even if the First Amendment does not protect his or her own conduct that breaches the statute. *State v. Mireles*, 16 Wn. App. 2d 641, 649 (2021).

In considering whether a statute is overbroad, this court first determines whether the enactment prohibits a substantial amount of protected speech. *City of Seattle v. Huff*, 111 Wn.2d 923, 925, 767 P.2d 572 (1989). A criminal statute requires scrutiny and may be facially invalid if it renders unlawful a substantial amount of constitutionally protected conduct even if it has a legitimate limited application. *Houston v. Hill*, 482 U.S. 451, 459, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987); *City of Seattle v. Huff*, 111 Wn.2d 923, 925 (1989). If a statute is facially invalid, this court must determine whether the regulation is constitutionally permitted nonetheless. *City of Seattle v. Huff*, 111 Wn.2d at 926.

The forum of the speech determines whether the government may constitutionally regulate the speech. *State v. Mireles*, 16 Wn. App. 2d 641, 649-50 (2021). If the law regulates speech within a public forum, the limitation must be "'content-neutral, and narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" *City of Seattle v. Huff*, 111 Wn.2d 923, 926 (1989) (quoting *Bering v. Share*, 106 Wn.2d 212, 222, 721 P.2d 918 (1986)). If the law regulates speech in a private forum, the State may regulate the speech as long as the distinctions drawn in the statute are reasonable in light of the purpose served by the

forum and are viewpoint-neutral. *City of Seattle v. Huff*, 111 Wn.2d at 926; *City of Seattle v. Eze*, 111 Wn.2d 22, 32, 759 P.2d 366 (1988)).

In *State v. Mireles*, 16 Wn. App. 2d 641 (2021), this court considered an overbreadth challenge of RCW 9.61.260, the cyberstalking statute. In upholding the three prongs of the cyberstalking statute, the Court of Appeals analogized to RCW 9.61.230, which statute governs telephonic harassment and has been repeatedly upheld as constitutional. *State v. Alphonse*, 147 Wn. App. 891, 906, 197 P.3d 1211 (2008); *State v. Alexander*, 76 Wn. App. 830, 832, 888 P.2d 175 (1995); *State v. Dyson*, 74 Wn. App. 237, 239, 872 P.2d 1115 (1994). We agree with the analysis in *State v. Mireles.*

This court, in *State v. Mireles*, held that the cyberstalking statute criminalizes private electronic communications to the same extent that the telephonic harassment statute criminalizes communication within its scope. 16 Wn. App. 2d 641, 652. In *City of Seattle v. Huff*, 111 Wn.2d 923, 928 (1989), our high court denied the overbreadth challenge to a City of Seattle telephonic harassment ordinance, which ordinance used identical language to the Washington's telephonic harassment statute. The Supreme Court concluded that the statute drew reasonable distinctions in light of the purpose of the nonpublic forum and the statute was viewpoint neutral. For these same reasons, the *Mireles* court found "the cyberstalking statute applied to the private forum to be constitutional." *State v. Mireles*, 16 Wn. App. 2d at 652.

The *Mireles* court observed that the cyberstalking statute also regulates speech in the public forum since the Internet has become the modern public square. *Packingham v. North Carolina*, ___U.S.___, 137 S. Ct. 1730, 1737, 198 L. Ed. 2d 273 (2017); *State v. Mireles*, 16 Wn. App. 2d 641, 652 (2021). Thus, the court questioned whether RCW 9.61.260 regulates, with overbreadth, speech in the public forum. This court concluded that the statute's intent requirement sufficiently limited its reach to conduct and that it "punishes not the content of speech, but rather the selection of a victim and directing the speech in such a way as to cause a specific harm to them." *State v. Mireles*, 16 Wn. App. 2d at 654.

The court, in *State v. Mireles*, noted that *State v. Talley*, 122 Wn.2d 192, 205-06, 858 P.2d 217 (1993), *Virginia v. Black*, 538 U.S. 343, 362 (2003), and *State v. Dyson*, 74 Wn. App. 237, 244 (1994) declare that the government has a compelling interest in preventing the harm caused by harassment and intimidation.

> While none of the cases specifically consider the "intent to *torment*" in their overbreadth analysis, *the outcome would be the same*. The intent is the same. The selection of the victim is the same. The harm is at least as great as that of harassment or intimidation.

*State v. Mireles*, 16 Wn. App. 2d at 654 (emphasis added). This court concluded torment to be more severe conduct than intimidation or harassment, based on the three terms' ordinary definitions found in *Webster's Dictionary*. *State v. Mireles*, 16 Wn. App. 2d at 654 n.5.

20

Apollo Warnock argues that, contrary to the *Mireles* court's holding, RCW

9.61.260's intent element does not necessarily save the statute from being overbroad,

citing *City of Bellevue v. Lorang*, 140 Wn.2d 19, 28-29, 992 P.2d 496 (2000). *Lorang*,

however, is distinguishable, because the ordinance at issue reached religious speech,

which speech the First Amendment affords strong protection. RCW 9.61.260 does not

cover religious speech.

*Vagueness*

Apollo Warnock argues that RCW 9.61.260 is unconstitutionally vague because of

the statute's use of the nebulous terms "harass," "injury," and "property." To repeat, the

statute declares, in pertinent part:

> (1) A person is guilty of cyberstalking if he or she, with intent to *harass*, intimidate, torment, or embarrass any other person, and under circumstances not constituting telephone harassment, makes an electronic communication to such other person or a third party:
> . . . .
> (c) Threatening to inflict *injury* on the person or *property* of the person called or any member of his or her family or household.

(Emphasis added.) Warnock asserts that, since the statute does not define any of these

three terms, a reader encounters uncertainty as to what the words mean and what conduct

the statute precludes. The State responds that none of the challenged terms render RCW

9.61.260 vague particularly since the courts, like laypeople, use dictionary definitions to

define the terms. We agree with the State.

21

The due process clauses of the Fifth and Fourteenth Amendments require that statutes afford citizens a fair warning of prohibited conduct. *State v. Murray*, 190 Wn.2d 727, 736, 416 P.3d 1225 (2018). A statute is unconstitutionally vague if: (1) it fails to define the offense with sufficient precision that a person of ordinary intelligence can understand it, or (2) it does not provide standards sufficiently specific to prevent arbitrary enforcement. *State v. Duncalf*, 177 Wn.2d 289, 296-97, 300 P.3d 352 (2013); *State v. Eckblad*, 152 Wn.2d 515, 518, 98 P.3d 1184 (2004). This court is "especially cautious in the interpretation of vague statutes when First Amendment interests are implicated." *City of Bellevue v. Lorang*, 140 Wn.2d 19, 31 (2000). The party challenging a statute's constitutionality carries the burden of proving the law to be unconstitutional beyond a reasonable doubt. *City of Spokane v. Douglass*, 115 Wn.2d 171, 177, 795 P.2d 693 (1990).

Despite a prohibition against vagueness:

> It is not necessary that a person be able to predict with complete certainty the exact point at which his or her actions would qualify as prohibited. Instead, as long as "a person of reasonable understanding is [not] required to guess at the meaning of the statute," "notwithstanding some possible areas of disagreement, the ordinance is sufficiently definite."

*State v. Murray*, 190 Wn.2d 727, 736 (2018) (quoting *State v. Duncalf*, 177 Wn.2d 289, 297 (2013) and *City of Spokane v. Douglass*, 115 Wn.2d at 179). A statute is not unconstitutionally vague because it fails to define some terms. *In re Personal Restraint of Troupe*, 4 Wn. App. 2d 715, 723, 423 P.3d 878 (2018). Instead, we give those terms

their plain and ordinary dictionary definitions. *In re Personal Restraint of Troupe*, 4 Wn. App. 2d 715, 723 (2018). This last principle defeats Apollo Warnock's challenge.

As to the enforcement requirement, the due process clause forbids laws containing no standards and allowing decision-makers to "subjectively decide what conduct the statute proscribes." *In re Personal Restraint of Troupe*, 4 Wn. App. 2d at 723. Nevertheless, a statute's invitation for a subjective evaluation to determine its violation does not render the statute unconstitutional. *In re Personal Restraint of Troupe*, 4 Wn. App. 2d at 723. The statute must invite an inordinate amount of discretion. *In re Personal Restraint of Troupe*, 4 Wn. App. 2d at 723.

In *City of Seattle v. Huff*, 111 Wn.2d 923 (1989), the Washington Supreme Court held that a City of Seattle telephonic harassment ordinance, which ordinance prohibited speech through the phone with the intent to harass, intimidate, torment, or embarrass another person, was not unconstitutionally vague. The city ordinance used language identical to the telephonic harassment statute, RCW 9.61.230, signifying that RCW 9.61.230 is not unconstitutionally vague. As recognized by *State v. Mireles*, RCW 9.61.230 mirrors the cyberstalking statute, RCW 9.61.260. As a result, RCW 9.61.260 is not unconstitutionally vague for the same reasons RCW 9.61.230 is not.

The term "harass" is "narrowly defined so that persons of common intelligence can ascertain when their intent falls within the ordinance's prohibitions. *City of Seattle v. Huff*, 111 Wn.2d at 929. Further, RCW 9.61.260 "provides adequate notice to persons of

23

common understanding as to the specific intent, the type of threat, and the person(s) to whom the threat must be directed." *City of Seattle v. Huff*, 111 Wn.2d at 930. Thus, the statute provides adequate standards that prevent arbitrary enforcement.

The terms "injury" and "property" are also sufficiently concrete. Warnock only argues that RCW 9.61.260 flunks constitutional muster because the statute fails to define the two words. Again, we give undefined words in statutes their ordinary meaning, such that RCW 9.61.260 is not vague. *In re Personal Restraint of Troupe*, 4 Wn. App. 2d 715, 723 (2018).

## CONCLUSION

We affirm Apollo Warnock's cyberstalking conviction.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, A.C.J.

_____
Staab, J.

24